STATE of Iowa, Plaintiff-Appellee,

v.

James A. JACKSON,
Defendant-Appellant.

No. 84–517.

Court of Appeals of Iowa.

March 31, 1986.

Max I. Exline, Des Moines, for defendant-appellant.

Thomas J. Miller, Atty. Gen., Rebecca L. Claypool, Asst. Atty. Gen., and Ray Kinley and Richard L. Richards, Asst. Polk Co. Attys., for plaintiff-appellee.

Heard by DONIELSON, P.J., and SNELL and SCHLEGEL, JJ.

SNELL, Judge.

Defendant James A. Jackson appeals his conviction for robbery in the first degree. He also appeals a subsequent district court order denying his motion for new trial, alleging newly-discovered evidence. His two appeals have been consolidated.

Michael Clark, an employee of Quik Trip on 1419 Ingersoll in Des Moines, testified that he was robbed by two individuals on February 16, 1982, at approximately 3:00 a.m. The first police officer to arrive at the scene was Douglas Harvey and he obtained descriptions of the robbers from Clark. One individual was described as black, bearded, wearing a ski mask, a dark-colored stocking cap, a green winter coat, tennis shoes, and carrying a shotgun. The other was also black and did not wear a mask. The robbers took primarily small bills from the cash register and also had Clark put blank money orders, redeemed bottle caps, and several rolls of coins in a paper sack.

Officers Stanley and Tellis were dispatched to investigate the robbery. Officers Stanley and Tellis observed an individual, identified as Jackson, running from the

Quik Trip. They lost sight of him briefly and then observed Jackson lying face down in the snow moving his arms, thrashing, or scooping snow. When the officers approached Jackson, he stated that he "didn't do anything" and after he was handcuffed, Jackson said that he had been "hit and hurt." Rolls of coins, bottle caps, and a brown paper sack were found where Jackson had been lying. Approximately fifty yards away from where Jackson was found, more coinage, a bank bag, and a ski mask were discovered in a parking lot.

Jackson was taken to the police car, given his *Miranda* rights, and waived them. At some point in the car, Jackson tried to raise his leg over the back seat to kick one of the officers. Officer Tellis described Jackson as sweating profusely, minimally excited and fairly scared. However, he testified that Jackson did not appear to be under the influence of any drugs or in need of medical attention for intoxication. In the squad car, Jackson tried to make a "deal" whereby he would provide information if the officers would let him "walk." Officer Tellis informed Jackson that he would not be released from custody. Jackson then proceeded to give Tellis a couple of different stories about what happened. One was that he was walking to a girlfriend's home when a Negro male with a shotgun knocked him over and dropped a sack of change, which Jackson decided to bury. Jackson said he knew the person and offered to take the officers to him if he was released. The other story was that he saw two individuals running toward a nearby apartment house.

After questioning in the squad car, Jackson was transported to the Quik Trip. Clark was advised that the officers had a person in custody that they thought was involved in the robbery. Clark at first viewed Jackson in the car, then requested that Jackson get out of the car. Clark stated that he really could not identify Jackson as one of the robbers because the robber wore a mask. However, Clark stated that the clothes Jackson was wearing looked like the clothes the robber had worn. Officer Tellis testified that Clark was unable to positively identify Jackson as the robber.

Jackson was transported to the police station and allowed to sleep until 8:15 a.m., when he was taken to the interrogation room. Detective Rowley, the interrogating officer, testified that on the way to the interrogation room, Jackson was "crying" and "screaming" and claimed that he was "high" on drugs. Detective Rowley testified that he told Jackson that he did not buy his act and that they were going to talk or Jackson would be returned to his cell. Rowley stated that "at that point, it was just like I turned on a switch in [Jackson] and he just sat right up and started talking." Jackson was read his rights and signed the written waiver of rights form. Rowley then asked Jackson what happened and Jackson confessed to the robbery in narrative form, very calmly and without hesitation.

After the interrogation, a urine test was given to Jackson and it revealed the presence of a high dosage of the drug Ephedrine.

On appeal, Jackson contends that the trial court erred by: 1) denying his motion to suppress the incriminating statements he made to the police officers following his arrest; 2) refusing to issue a limiting instruction to the jury requiring them to view the crime scene film during deliberations in the same fashion as it was shown during trial; 3) denying his motion for mistrial because of the State's failure to disclose that a suspect was shown to the Quik Trip attendant for identification prior to Jackson's being shown to the attendant; and 4) denying his post-trial motion for new trial on the ground that the existence of the "first suspect" constituted newly-discovered evidence which he did not discover in time to use at trial. Jackson also argues that his trial counsel rendered ineffective assistance by failing to challenge the admissibility of Clark's identification testimony on the ground of impermissibly suggestive identification procedures.

**Motion to Suppress.** Jackson initially contends that the trial court erred by denying his motion to suppress the incriminating statements he made to police officers following his arrest. He asserts that the statements themselves, and also his purported waiver of his *Miranda* rights, were involuntary due to a combination of circumstances: the effect of drugs he had ingested before arrest, coercion by police officers, and his history of psychiatric difficulties. We must address two separate issues—whether the State proved that Jackson's statement was made after an effective waiver of his *Miranda* rights, and whether such statement was voluntary.

**A. Waiver of Miranda Rights.** Once the issue of the validity of an alleged waiver of constitutional rights is raised, the State must prove by a preponderance of the evidence that such waiver was knowingly, voluntarily, and intelligently given. *State v. Whitsel*, 339 N.W.2d 149, 152 (Iowa 1983). Our review of the trial court's ruling is de novo requiring an independent evaluation of the totality of the circumstances. *Id.* at 153. An express written waiver of constitutional rights is not alone sufficient to establish the waiver is knowing, intelligent, and voluntary. *Fryer v. State*, 325 N.W.2d 400, 409 (Iowa 1982). However, "[a]n express written waiver 'is usually strong proof of the validity of that waiver.'" *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979)).

The record reveals that Jackson was arrested at approximately 3:06 a.m. on February 16, 1982. He was immediately orally given his *Miranda* rights by one of the arresting officers. Jackson was then asked if he wanted to talk about why he was in the area. Jackson responded with two different stories to explain his conduct at the time of his arrest, neither implicating him in the Quik Trip robbery.

Over five hours later, Jackson was taken from his jail cell to the interrogation room in the police station. There, prior to questioning, the interrogating officer read Jackson his *Miranda* rights again. The waiver of rights form was then given to Jackson to read and he signed the form. After Jackson executed the waiver, the officer asked Jackson what had happened, and Jackson responded by confessing to the robbery in a narrative fashion.

Jackson claims that he was under the influence of drugs to the extent that he cannot remember his being arrested or receiving and waiving his *Miranda* rights. He argues that the presence of the high dosage of Ephedrine in his urine verifies that he was incapable of waiving his rights knowingly, intelligently, and voluntarily.

Officer Tellis testified that he had the opportunity to view Jackson's demeanor inside the police car with the dome light turned on. He stated Jackson appeared fairly calm; he did not seem highly agitated or unsteady as if he was under the influence of alcohol or narcotics. Jackson did not stammer, his eyes were not glassy, and his breath did not smell of alcohol. He also was lucid enough to try to bargain with the officers for his release.

Officer Rawley also testified that at the time of Jackson's waiver and confession, he was very calm, he did not stammer or hesitate, and his features and movements appeared very normal. Under the totality of the circumstances, we find that the State satisfied its burden of proving that Jackson was capable of understanding and knowingly waiving his *Miranda* rights.

**B. Voluntariness of the Statement.** The Iowa Supreme Court has addressed the issue concerning the voluntariness of confessions or inculpatory statements as follows:

> In order to establish the voluntariness of a defendant's inculpatory statements, the State must demonstrate from the totality of the circumstances that the statements were the product of an essentially free and unconstrained choice, made by the defendant at a time when his will was not overborne nor his capacity for self-determination critically impaired. *State*

*v. Cullison,* 227 N.W.2d 121, 127 (Iowa 1975).

*State v. Hodges,* 326 N.W.2d 345, 347 (Iowa 1982). The court has also found that many factors may be considered under the totality of the circumstances, but no one factor is determinative. *Whitsel,* 339 N.W.2d at 153. These factors include:

> The defendant's knowledge and waiver of his *Miranda* rights, the defendant's age, experience, prior record, level of education and intelligence, the length of time defendant is detained and interrogated, whether physical punishment was used, including the deprivation of food or sleep, defendant's ability to understand the questions, the defendant's physical and emotional condition and his reaction to the interrogation, whether any deceit or improper promises were used in gaining the admissions, and any mental weakness the defendant may possess.

*Id.* (quoting *Hodges,* 326 N.W.2d at 348).

Jackson contends that his confession was involuntary because he was under the influence of drugs, the police improperly promised leniency to solicit his confession, and he had a history of psychiatric difficulties.

"The mere fact one is under the influence of a drug at the time of making an inculpatory statement does not render the statement involuntary, although it is a proper factor for the jury to consider in weighing the evidence." *State v. Wilson,* 264 N.W.2d 614, 614–15 (Iowa 1978) (defendant's inculpatory remark admissible despite the fact his eyes were glassy, he looked a "little spacey," and he appeared drowsy); *see also State v. Rank,* 214 N.W.2d 136, 139 (Iowa 1974) (defendant's incriminating statement admissible despite uncontroverted evidence that he was "high" on a controlled substance).

■ Given the officers' testimony that Jackson appeared coherent, calm, and alert, we conclude that the presence of Ephedrine in Jackson's urine did not render his statement involuntary.

■ Furthermore, the record is clear that no promise of leniency was made to Jackson. Jackson argues that an implied promise of release can be found in Officer Rowley's statement: "I told him I didn't buy his act, that we were going to talk or I was going to put him back in his cell." We find that this statement neither explicitly nor implicitly refers to release or leniency.

■ Factors which demonstrate the voluntariness of Jackson's confession include his previous experience with law enforcement procedure, and the limited duration of his interrogation. Jackson's confession came within minutes of his waiver of his *Miranda* rights and in response to Officer Rowley's first question. The entire interview lasted only thirty to forty-five minutes. While Jackson's substance abuse counselor testified that Jackson had a history of drug abuse and drug-related psychoses, we do not find this factor sufficient to render his confession involuntary. Jackson points to no threats or any use of force that might render his confession involuntary.

In sum, the totality of the circumstances reveals the complete absence of coercion and demonstrates that Jackson's confession was voluntary.

■ **Film Exhibit.** Jackson next contends that the trial court erred by refusing to give the jurors a limiting instruction requiring them to view a crime scene film during deliberations in the same way the film had been shown during trial. The film in question was taken during the robbery by an automatic camera installed in the Quik Trip store. When Clark, the Quik Trip attendant, opened the register, he activated a switch triggering the operation of a hidden motion picture camera. During the direct examination of Clark, the State showed the film once, running it straight through from start to finish without interruption. This showing lasted a minute or two. During deliberations, the jury requested an opportunity to see the film again. The trial court sent a projector into the jury room without limiting the jury's method of viewing. Jackson contends that

he was denied a fair trial because during deliberation the jurors viewed "freeze frames" and viewed some segments of the film repeatedly, thus permitting them to overemphasize the film to the exclusion of the other evidence adduced at trial.

According to the jury foreman, the jury viewed the film once straight through, and then they concentrated on several frames depicting a tear in the robber's jacket. They compared the condition of the robber's jacket with Jackson's coat, which was also admitted into evidence. Because no reference to the tear was made during trial, Jackson argues that the jury in effect created new evidence. Jackson contends that the film should have been excluded from deliberations or, alternatively, the jury should have been instructed to view the film straight through without interruption as it was shown during trial.

Iowa R.Crim.P. 18(5)(e) provides, in pertinent part, that "[u]pon retiring for deliberations the jury *may* take with it all papers and exhibits which have been received in evidence, and the court's instructions." (emphasis added). This rule "leaves it to the trial court, in its discretion, to determine whether exhibits are to be taken by the jury during deliberations." *State v. Thompson*, 326 N.W.2d 335, 337 (Iowa 1982); *see also State v. Baumann*, 236 N.W.2d 361, 366 (Iowa 1975) (trial court has considerable discretion to either grant or deny the submission of exhibits to the jury). Appropriate considerations in the exercise of this discretion are:

(i) whether the material will aid the jury in a proper consideration of the case;

(ii) whether any party will be unduly prejudiced by submission of the material; and

(iii) whether the material may be subjected to improper use by the jury.

*Id.* (quoting *State v. Shea*, 218 N.W.2d 610, 615 (Iowa 1974). Reversal is warranted only if the trial court abuses its discretion in sending evidence to the jury room and prejudice results. *Shea*, 218 N.W.2d at 615–16 (defendant's rights not adversely affected when apparent jurors were "not substantially swayed" by the presence of narcotics exhibits in jury room).

■ In this case, there is no question that the motion picture film of the robbery was properly admitted into evidence. *See State v. Deering*, 291 N.W.2d 38, 39–40 (Iowa 1980). Clark testified that the film clearly and accurately portrayed the robbery as it occurred on February 16, 1982. Jackson's jacket was also an exhibit admitted into evidence. Clark testified that Jackson's jacket was like that worn by the robber during the robbery, and he was ninety-nine percent sure that it was the robber's jacket.

The fact that the jury used the freeze frame technique to enable them to more closely scrutinize both of these exhibits does not constitute improper use of the film exhibit. There is no indication in the record that the jury's comparison alone induced their verdict. We hold that the trial court did not abuse its discretion in this case in granting the jury's request to view the film during deliberations without limiting instructions.

■ **Exculpatory Evidence.** Jackson next contends that the trial court should have granted his motion for mistrial because of the State's failure to disclose exculpatory evidence prior to trial. During Clark's cross-examination at trial, he disclosed for the first time that Jackson was not the first suspect brought to the Quik Trip for identification. Defense counsel immediately moved for a mistrial on the basis of Clark's earlier testimony which indicated that the police brought back only one suspect for his identification. Officer Tellis also had testified by deposition that he was not aware of any of his colleagues coming into contact with or detaining any other suspects in connection with the robbery. Jackson argued that the existence of this "first suspect" was exculpatory evidence which the State was required to disclose. Clark's testimony during cross-examination was the first information that the county attorney had regarding an additional suspect. None of the police reports

indicated that another suspect was returned to the scene for identification. The trial court overruled Jackson's motion for mistrial. The court later denied Jackson's motion for new trial based on the same ground.

Now Jackson argues that the police department's failure to preserve field interrogation reports containing the identity of and reasons for detaining the first suspect constitutes destruction of exculpatory evidence.

We dismiss Jackson's argument on the ground that the existence of the first suspect does not constitute exculpatory evidence. Clark's testimony regarding the first suspect is the following:

Q. At any point during the 16th, the morning of the 16th, was anybody else brought back to the store for purposes of being viewed by you? A. Yes.

Q. Okay. And do you know who that individual was? A. No, I don't.

Q. Okay. Do you recall what that individual was wearing at the time they were brought back to be viewed by you? A. He was wearing a very long trench coat, brown.

Q. And at approximately what time would that person have been brought back to be viewed by you on the 16th? A. He was the first suspect that was brought back.

Q. He was the first person brought back for you to view? A. Yes.

Q. Do you recall the officers who brought that man back to the scene? A. No, I don't.

Q. Could it have been the same officers that brought my client back to the scene? A. No.

Q. You are positive about that? A. Yes.

Officer Harvey testified at the hearing on Jackson's motion for new trial that he believed a suspect other than Jackson was brought to the scene, "but he was determined not to have been involved in the incident."

The record gives no indication that the identity of or reasons for detaining the first suspect would tend to clear Jackson from fault. The mere fact that police officers promptly brought a suspect, other than the defendant, to the scene whom the crime victim did not even equivocally identify is not sufficient to qualify as exculpatory evidence.

■ For similar reasons Jackson's argument that the existence of the first suspect constitutes newly-discovered evidence also fails. To prevail on a motion for new trial based on newly-discovered evidence, the defendant bears the burden to show that:

(1) the evidence was discovered after the verdict;

(2) it could not have been discovered earlier in the exercise of due diligence;

(3) the evidence is material to the issues in the case and not merely cumulative or impeaching; and

(4) the evidence probably would have changed the result of the trial.

*State v. Allen*, 348 N.W.2d 243, 246 (Iowa 1984).

■ In the case at bar, the evidence in question came to light during the cross-examination of the State's first witness at trial. It was not discovered after the jury verdict was rendered. Furthermore, it is difficult for us to imagine how the evidence of a first suspect could have been material or changed the result of the trial when it was immediately and conclusively determined that the first suspect was not involved in the Quik Trip robbery.

We conclude that Jackson has failed to establish the requisite elements to prove that a new trial is warranted on the basis of newly-discovered evidence. Therefore, the trial court properly denied his motion for new trial.

**Victim Identification.** Jackson also argues that he was denied effective assistance of counsel because his trial counsel failed to timely challenge the admissibility of Clark's identification testimony. Jackson argues that Clark's testimony was un-

certain and equivocal at best and he suggests that Clark would not have identified him at all but for the following factors: 1) the arresting officer's statement to Clark that they "had a person in custody they thought was involved"; 2) Jackson was first presented for identification while seated in the back of the police car; and 3) after Clark stated he could not identify the robber, the arresting officer pressed him by saying, "Well, is that the clothing?" Jackson's counsel did file a motion to suppress Clark's identification of Jackson's clothing; however, the trial court denied the motion because it was not timely. During trial, Clark was subject to rigorous cross-examination by Jackson's counsel regarding his ability to identify Jackson and his clothing.

▮▮▮▮ When a defendant relies on a specific omission to prove ineffective assistance of counsel, two conditions must be demonstrated:

(1) counsel's performance was so deficient that counsel was not functioning as the "counsel" guaranteed by the sixth amendment, and

(2) the deficient performance so prejudiced the defense as to deprive the defendant of a fair trial.

*State v. Losee*, 354 N.W.2d 239, 243 (Iowa 1984) (citing *Strickland v. Washington*, 466 U.S. 668, ——, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984)). The ultimate test is whether under the entire record and totality of the circumstances counsel's performance was within the range of normal competency. *Meier v. State*, 337 N.W.2d 204, 206 (Iowa 1983); *Hinkle v. State*, 290 N.W.2d 28, 30 (Iowa 1980).

▮▮▮▮ The test for ineffective assistance was most recently set forth in *Strickland,* where the Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at ——, 104 S.Ct. 2068, 80 L.Ed.2d at 698 (1984). The defendant must

satisfy this burden by a preponderance of the evidence and rebut the presumption of counsel's competence. *Meier,* 337 N.W.2d at 206. Ordinarily, the accused is bound by the tactical or strategic decisions made by counsel, even those rising to constitutional dimensions. *Sims v. State,* 295 N.W.2d 420, 424 (Iowa 1980).

▮▮▮ Where the ineffective assistance claim is based on trial counsel's failure to suppress identification evidence, we must first decide if the procedure used by the police was in fact "impermissibly suggestive." If we find that it was, we determine if, under the totality of the circumstances, there was "a very substantial likelihood of irreparable misidentification." *State v. Newman,* 326 N.W.2d 788, 794 (Iowa 1982).

▮▮▮ It is generally conceded that one-on-one confrontations or "show-ups" between an accused and an eyewitness are inherently suggestive. *State v. Salazar,* 213 N.W.2d 490, 493 (Iowa 1973). However, the Iowa Supreme Court has recognized that "on-the-scene identification procedures, held shortly after the crime, are not violative of due process unless the confrontation is *unnecessarily* suggestive." *Id.* at 493–94.

▮▮▮ The presence of police officers is a usual and necessary element in the ordinary identification confrontation. *Id.* Nor is the fact that the defendant is handcuffed or near a police car sufficient to support a claim of suggestiveness. *Id.* (not suggestive where 12 officers were on scene, defendant was handcuffed and placed against police car for identification); *State v. Schaffer,* 182 N.W.2d 413, 414 (Iowa 1970) (not unnecessarily suggestive where defendant was handcuffed and inside police car when identified); *State v. Smith,* 182 N.W.2d 409, 411–12 (Iowa 1970) (not impermissibly suggestive where witness viewed defendant in the police station while he was at booking counter); *Dillard v. State,* 257 Ind. 282, 274 N.E.2d 387, 390 (1971) (not impermissibly suggestive where defendant was returned to scene in police car, identification witness was surrounded by officers,

and defendant was forced to get out of police car handcuffed with blood on his face). In fact, such prompt on-the-scene identifications promote fairness by assuring reliability. *Salazar*, 213 N.W.2d at 495.

In the case at bar, Jackson was handcuffed, placed in a police car, and taken to the Quik Trip about fifteen to twenty minutes after the store had been robbed. When Jackson was taken out of the police car in the parking lot, Clark stated that he could not identify the robber's face, but Jackson's clothes looked like what the robber had worn.

We find that the points Jackson raises are usual elements in any police-conducted on-the-scene confrontation and to the extent that they are suggestive, they are not unnecessarily so. We hold that Jackson was not denied any constitutional rights by the procedure employed in his show-up at the Quik Trip. Therefore, his trial counsel's failure to timely challenge the identification procedure does not constitute ineffective assistance. A claim of ineffective assistance cannot be predicated upon counsel's failure to assert a meritless claim.

AFFIRMED.