**STATE of Iowa, Appellee,**

v.

**Kevin Maurice GRIFFIN, Appellant.**

No. 95–1148.

Supreme Court of Iowa.

May 21, 1997.

---

Terry Wright, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, John P. Sarcone, County Attorney, and Mary Pat Hoffman, Assistant County Attorney, for appellee.

Considered by HARRIS, P.J., and LAVORATO, NEUMAN, SNELL, and ANDREASEN, JJ.

HARRIS, Justice.

There are four assignments of error in this appeal following convictions of first-degree kidnapping in violation of Iowa Code sections 710.1 and 710.2 (1995),[1] and of willful injury

---

1. Iowa Code § 710.1 provides in relevant part: A person commits kidnapping when the per-

son either confines a person or removes a

in violation of Code section 708.4. Like the court of appeals, we find no merit in the assignments and affirm both convictions.

Viewing, as we should, the evidence in the light most consistent with the verdicts, the defendant Kevin Griffin attacked Dee Dee Dorley Griffin, his common-law wife. He choked, beat and sexually assaulted her. Dee Dee's injuries were severe and required treatment by a trauma surgeon. She was bruised and cut by glass all over her body. The police described the bed and walls of the motel room as smeared with blood.

The attack followed a fund-raising project for a church youth group. Dee Dee and Griffin were employed together for this effort, and solicited funds door-to-door. After finishing at approximately 9 p.m., both went to a motel where they were staying. They then went to a lounge where Griffin purchased crack cocaine and then to a liquor store and bought alcohol.

When they returned to the motel, Dee Dee told Griffin she wanted to rent her own room rather than to stay with him. He responded that she "had no choice" other than to stay in the same room with him. Dee Dee's sister, Tressa Ramsbottom, and her boyfriend were staying in another room at the same motel. Dee Dee then called Tressa to let her know what room she was in because she was afraid Griffin "was going to wack out on crack again" and hurt her. Later Dee Dee asked Griffin if she could call Tressa on the pretense that Tressa's boyfriend wanted to see him. Griffin told Dee Dee that Tressa and her boyfriend could come to the room "in fifteen minutes." When they arrived Griffin answered the door and told them to come back later.

By this time Griffin had already begun to smoke the crack and ordered Dee Dee to undress and made her stay disrobed to prevent her from leaving. Dee Dee then smoked crack and drank some of the alcohol.

Griffin turned violent and began choking Dee Dee while holding her down on the bed and accused her of being unfaithful to him. Griffin hit Dee Dee repeatedly over her head and body with a bottle and sexually assaulted her with a bottle. Dee Dee eventually lost consciousness at which time Griffin continued to sexually abuse her. Dee Dee awoke the next day at approximately 1:30 in the afternoon.

In Griffin's absence Dee Dee then called Tressa and asked her to come to the room. After she did, Griffin returned and told Tressa to leave. Dee Dee mouthed the words "call the police" to Tressa and she did so. The police arrived shortly thereafter and found the bed and walls of the motel room smeared with blood.

A jury found Griffin guilty of first-degree kidnapping and willful injury. He was sentenced to life in prison and then brought this appeal. The matter is before us on further review from a court of appeals decision affirming the convictions.

I. In a sufficiency-of-the-evidence challenge we review all the evidence to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the offense charged. *State v. Robinson,* 288 N.W.2d 337, 339 (Iowa 1980). We review the defendant's constitutional challenges de novo. *State v. Finnel,* 515 N.W.2d 41, 43 (Iowa 1994). Rulings on evidentiary matters are generally within the trial court's discretion and are reversed only on a showing of abuse. *State v. Hubka,* 480 N.W.2d 867, 868 (Iowa 1992).

II. Griffin argues there was insufficient evidence to support the kidnapping conviction because the confinement was only incidental to the sexual assault. He claims: (1) Dee Dee voluntarily came to his motel room to smoke crack cocaine and drink alcohol; (2) Dee Dee's sister was staying at the same motel and knew which room she was in; and

person from one place to another, knowing that the person who confines or removes the other person has neither the authority nor the consent of the other to do so; provided, that to constitute kidnapping the act must be accompanied by one or more of the following:

. . . .

3. The intent to inflict serious injury upon such person, or to subject the person to a sexual abuse.

Iowa Code § 710.2 provides that first-degree kidnapping occurs "when the person kidnapped, as a consequence of the kidnapping, suffers serious injury, or is intentionally subjected to torture or sexual abuse."

(3) the only time Dee Dee could not leave the room was during the sexual assault. The case is a bit unusual, although not unique, in that the victim first entered the room voluntarily and consented to join in unlawful activity. The point of the case, though, is that this does not prevent the law from recognizing her as a victim, or from recognizing her attacker as a kidnapper.

 In order to "confine" another person in violation of Iowa Code section 710.1, the confinement must exceed what is inherently incident in the underlying felony. This is called the "incidental rule." *State v. McGrew*, 515 N.W.2d 36, 39 (Iowa 1994); *State v. Rich*, 305 N.W.2d 739, 745 (Iowa 1981). "No minimum period of confinement is required to convict a defendant of kidnapping." *McGrew*, 515 N.W.2d at 39. The confinement must however be "significantly independent of the confinement incident to the commission of the underlying crime." *Id.* Confinement reaches the level required for section 710.1 if it "substantially increases the risk of harm to the victim, significantly lessens the risk of detection, or significantly facilitates escape following the commission of the underlying offense." *Id.* If the defendant merely "seizes" the victim during the commission of the crime, this does not rise to the level of confinement required for kidnapping. *State v. Mead*, 318 N.W.2d 440, 445 (Iowa 1982).

The policy behind the incidental rule is that confinement against the victim's will is often an attendant circumstance in the commission of many of the underlying crimes in section 710.1. *McGrew*, 515 N.W.2d at 39; *Mead*, 318 N.W.2d at 445; *see also* Natalie A. Kanellis, Note, *Kidnapping in Iowa: Movements Incidental to Sexual Abuse*, 67 Iowa L.Rev. 773, 780 (1982). We have said the legislature did not intend to "afford prosecutors the option of bootstrapping convictions for kidnapping, carrying life sentences, onto charges for crimes for which the legislature provides much less severe penalties." *McGrew*, 515 N.W.2d at 39.

 The evidence showed that Griffin confined Dee Dee for a longer period of time than was inherently required to commit the underlying offense of sexual assault. Dee Dee was not free to leave the motel room the night of the assault and testified why Griffin ordered her to take off her clothes when they were in the motel room.

> Kevin always felt if I was naked and he started hitting me I would not run out, because I had no clothes on. So that was the purpose of Kevin taking my clothes off of me or having me take them off.

So, by ordering Dee Dee to take off her clothes prior to the sexual assault, Griffin was able to keep her confined to the motel room prior to the assault, lowering his chances of detection and increasing the risk of harm to Dee Dee. *See McGrew*, 515 N.W.2d at 39; *Rich*, 305 N.W.2d at 745.

There was more. Griffin did not let Dee Dee's sister, Tressa, or her sister's boyfriend enter the motel room after they had been summoned by Dee Dee the night of the assault. This also occurred prior to the sexual assault and likewise lowered Griffin's chances of detection and increased the risk of harm to Dee Dee.

Confinement continued after the sexual assault. When Tressa telephoned Dee Dee and Griffin's room the next morning, Griffin told her that they were sleeping. When asked if Tressa could borrow some shampoo Griffin told her he would "just throw the bottle of shampoo out in the hall outside the door." Tressa did go to the motel room after Griffin stepped outside the room the following day. Griffin shouted at her to not go in the room because Dee Dee was sleeping. When Tressa did anyway, Griffin followed her into the room and said he "wasn't done" with Dee Dee. Griffin's continued confinement of Dee Dee prevented her from making contact with others, further lowering any chance of detection.

Griffin points out that Dee Dee voluntarily entered the motel room with him to smoke crack cocaine and drink alcohol, but this does not mean that confinement was limited to the actual assault. Griffin's confinement of Dee Dee both before and after the sexual assault takes the case outside the incidental rule. We reject Griffin's challenge to the sufficiency of the evidence to support his kidnapping conviction.

III. In another assignment Griffin contends the district court abused its discretion in allowing Lauri Schipper to testify as an expert witness, and in allowing her to testify concerning the battered woman syndrome, particularly as manifested by a victim's refusal to testify against her batterer. Dee Dee had initially stated, while being treated at the hospital, that Griffin had assaulted her. She then recanted her story. Then at trial she testified consistently with her first version of the event. The credibility of Dee Dee's trial testimony thus became an issue.

Griffin first claims Schipper was not qualified to testify as an expert witness, arguing she did not possess the educational and certification credentials required for an expert witness. Second, Griffin contends Schipper was improperly allowed to testify on the credibility of Dee Dee's testimony. The determination whether a witness is qualified to render expert opinions lies within the discretion of the trial court. *State v. Gartin*, 271 N.W.2d 902, 912 (Iowa 1978). Iowa rule of evidence 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of opinion or otherwise."

■ Although Griffin contends otherwise, we think Schipper's credentials are impressive and easily qualify her status as an expert on battered women. She holds a degree in social work from Iowa State University. She was executive director of the Iowa Coalition Against Domestic Violence and had served as executive director of Assault Care Center, a battered woman's shelter and rape crisis center. She served in these director positions for ten years and was involved in counseling approximately 2000 battered women. She has been involved in statewide domestic abuse training of doctors, nurses, lawyers, judges and police officers. She was a member of this court's task force on domestic violence and contributed to the publication of the task force report. She has been published in the Iowa medical society journal. She has also been employed as a social worker. Schipper is thus uniquely qualified to render expert opinions on battered women.

■ This leaves only Griffin's contention that her testimony crossed the line from being helpful to the jury and became an improper conclusion concerning a defendant's guilt. That question focuses on rule of evidence 702's requirement that the proffered expert testimony "assist" the trier of fact. We have said we are "generally committed to a liberal rule which allows opinion testimony if it will aid the jury in screening the properly admitted evidence to ascertain the truth." *State v. Myers*, 382 N.W.2d 91, 93 (Iowa 1986); *State v. Hall*, 297 N.W.2d 80, 84 (Iowa 1980); *see also Grismore v. Consolidated Prods. Co.*, 232 Iowa 328, 339–61, 5 N.W.2d 646, 654–63 (1942). We have consistently recognized a line beyond which this liberal admission policy cannot go. In *Myers* we agreed that an expert "is not permitted to express an opinion as to the ultimate fact of the accused's guilt or innocence." *Myers*, 382 N.W.2d at 97; *see also State v. Oppedal*, 232 N.W.2d 517, 524 (Iowa 1975); *Grismore*, 232 Iowa at 361, 5 N.W.2d at 663. Further, because

> [t]he ultimate determination of the credibility or truthfulness of a witness is not "a fact in issue," but a matter to be generally determined solely by the jury ... expert opinions as to the truthfulness of a witness [are] not admissible pursuant to rule 702.

*Myers*, 382 N.W.2d at 97. So, if the effect of the expert opinions in a case is the equivalent of "opining on the truthfulness of the complaining witness," this testimony is not admissible. *Id.*

In view of the testimony that Dee Dee temporarily recanted her story, the prosecutor asked Schipper if she ever "run[s] into victims who refused to testify against their batterer." Schipper testified as follows:

> Well, based on the battered women's syndrome, it is the battered woman's perception, reasonable perception that another beating is inevitable. And that all of our assistance, meaning the criminal justice system, counselors, our assistance will not be effective in stopping the violence. It hasn't been in the past for her, and so it is her reasonable belief that to testify against the batterer and not—versus showing him loyalty, being a wonderful actress in mak-

ing sure that he believes she won't testify, that she will lie for him, she will do whatever it takes, is a life-saving coping skill for her.

I hear law enforcement officers tell me all the time, battered women, they lie and they're great actresses. And my response is always, "they better be great actresses. Their life may depend on it."

Q. Why, in your experience, might a woman who's a victim of domestic violence protect the batterer, based on your knowledge of the models and your research and your experience in this area? . . . . A. Well, the same reason. It's very important for her to prove loyalty, to focus on his needs and to make sure that he understands that she is in his camp at all times. Also because of the psychological terrorism that I referred to earlier. At some point she may have literally bonded with the batterer and believes his perceptions that it is all her fault. That he is omnipotent in her life and that it's her job to protect him.

The witness did not offer an opinion on Dee Dee's credibility, but instead testified concerning the medical and psychological syndrome present in battered women generally. We think this expert testimony was appropriate and conclude the district court did not abuse its discretion by admitting it. Griffin's contention to the contrary is without merit.

IV. Neither do we find merit in a challenge to two of the State's peremptory challenges during jury selection. An African-American, Griffin assails the two challenges because they were directed against the only two African-American members of the jury panel. He claims this violated the equal protection clause of the fourteenth amendment to the federal Constitution. See Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69, 82–83 (1986).

In Batson the United States Supreme Court held that the equal protection clause of the fourteenth amendment prevents a prosecutor from using peremptory strikes to challenge potential jurors "solely on account of their race." Id. at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 83. Under Batson and our own decisions in State v. Veal, — N.W.2d —— (Iowa 1997), State v. Knox, 464 N.W.2d 445

(Iowa 1990), and State v. Watkins, 463 N.W.2d 411 (Iowa 1990), a defendant must first establish a prima facie case of purposeful discrimination in selection of the jury panel. Batson, 476 U.S. at 96, 106 S.Ct. at 1722–23, 90 L.Ed.2d at 87; Knox, 464 N.W.2d at 448. "To establish such a case, the defendant . . . must show that he [or she] is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." Batson, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87 (citation omitted). "In determining whether a defendant has established the requisite showing of purposeful discrimination, the court should consider all relevant circumstances including, but not limited to, a pattern of strikes against black jurors, as well as the prosecutor's questions and statements during voir dire." Knox, 464 N.W.2d at 448; accord Batson, 476 U.S. at 96–97, 106 S.Ct. at 1722–23, 90 L.Ed.2d at 87–88.

Once this prima facie case of purposeful discrimination is made, an inference arises that the government violated the defendant's equal protection rights and "the State has the burden of articulating a clear and reasonably specific" race-neutral explanation for the peremptory strike. Knox, 464 N.W.2d at 448; accord Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. The prosecutor's explanation

need not rise to the level justifying exercise of a challenge for cause. But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he [or she] challenged jurors of the defendant's race on the assumption—or his [or her] intuitive judgment—that they would be partial to the defendant because of their shared race.

Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. The race-neutral explanation must be "related to the particular case to be tried." Id. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88 (citations omitted). Because the trial court's determination of whether purposeful discrimination occurred "will largely turn on the evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Knox, 464

N.W.2d at 448; *accord Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21, 90 L.Ed.2d at 89 n. 21.

The prosecutor in this case exercised her peremptory challenges on the only two African–American prospective jurors, thereby establishing a prima facie case of purposeful discrimination. The prosecutor then articulated her reasons for using the peremptory challenges:

> The reason that I struck [a black female juror] was because [the defense counsel] asked her the question whether anyone had sat on previous juries. She mentioned that she had sat on a willful jury and that they came back with a lesser-included offense. I don't particularly want any jurors in this case that have come back with lesser-included offenses on criminal cases. It has nothing to do with her race. The other person that was on that jury is a [white female].... And [defense counsel] struck her before I had a chance to, but I had a note on my card here that says I want to strike because of the willful. That's the same note I put on [the black female juror]. The same note I put on the [black male juror] who is the other black juror.
>
> I don't care what color they are. But if they come back with a lesser-included offense in a criminal case, that's something I take into consideration when I am making my strikes.
>
> ....
>
> My point is, judge, I don't care what color these people are. Those three people mentioned that they came back with a lesser in a willful case, and that's the basis for my strike.

These qualify as racially-neutral reasons. There is nothing to suggest they were a mere pretext. The prosecutor was concerned with obtaining a conviction on the most serious charges against *Griffin* and did not want jurors who had served on previous juries that convicted on lesser-included offenses. In *United States v. Moreno,* 878 F.2d 817, 820–21 (5th Cir.1989), the court held a prosecutor's strike of a potential juror because he had previously served on a jury in a case in which a guilty verdict was not reached was a race-neutral reason. In so holding the court stressed the deference given to the trial court's factual finding that the prosecutor's articulated reason was race-neutral. *Moreno,* 878 F.2d at 821.

Similarly in *United States v. Roan Eagle,* 867 F.2d 436, 441–42 (8th Cir.1989), the court held a prosecutor's peremptory strike of a juror because of his service on a prior jury that had acquitted a defendant was a race-neutral reason. *See also United States v. Thompson,* 827 F.2d 1254, 1260 (9th Cir. 1987) ("Excluding jurors because ... they acquitted in a prior case ... is wholly within the prosecutor's privilege.").

The assignment is without merit.

V. We have not overlooked Griffin's challenge to a trial court conclusion that the warrantless search of his room was with his consent. The record shows the district court was correct in finding that Griffin "freely and voluntarily gave his consent to the search and consent was given without any duress or coercion of any kind."

We thus find all of Griffin's assignments to be without merit.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**