**IN THE COURT OF APPEALS OF IOWA**

No. 15-0590
Filed April 27, 2016

**STATE OF IOWA,**
         Plaintiff-Appellee,

**vs.**

**TERRACE TYRONE PERKINS,**
         Defendant-Appellant.
_____

         Appeal from the Iowa District Court for Scott County, John D. Telleen

(motion to suppress) and Mark D. Cleve (trial), Judges.

         The defendant appeals from his convictions for robbery in the first degree

and willful injury causing serious injury following a jury trial.  **AFFIRMED.**

         Mark C. Smith, State Appellate Defender, and Patricia Reynolds, Assistant

Appellate Defender, for appellant.

         Thomas J. Miller, Attorney General, and Tyler J. Buller, Assistant Attorney

General, for appellee.

         Considered by Danilson, C.J., and Vogel and Potterfield, JJ.

**POTTERFIELD, Judge.**

Terrace Perkins appeals from his convictions for robbery in the first degree and willful injury causing serious injury following a jury trial. Perkins maintains his right to due process was violated when the court admitted an audio recording as well as testimony about the recording because officers used an impermissibly suggestive out-of-court identification procedure. He also maintains the trial court should have found the State used a strike to remove a prospective juror in a racially discriminatory manner. Lastly, he argues he received ineffective assistance from trial counsel because counsel failed to argue the proper weight-of-the-evidence standard after making a motion for a new trial.

**I. Background Facts and Proceedings**

On August 29, 2014, Perkins was charged by trial information with robbery in the first degree and willful jury causing serious injury. The State also provided notice that it intended to seek the habitual offender sentencing enhancement pursuant to Iowa Code sections 902.8 and 902.9(3) (2013). Perkins was charged along with a co-defendant, Matthew King.

On December 12, 2014, Perkins filed a motion to have evidence excluded at trial.[1] He alleged that a police detective had used an impermissibly suggestive identification procedure regarding an audio recording of Perkins speaking to King and that the use of the procedure violated his right to due process. Following a hearing on the matter, the district court filed a written ruling on February 12, 2015. In the ruling, the court found, "The court . . . need not ultimately determine

---

[1] Perkins's first trial commenced on November 17, 2014, and ultimately concluded in a mistrial.

whether the procedure employed by Detective Ells was 'unnecessarily or impermissibly suggestive' because under the totality of the circumstances there is not 'a very substantial likelihood of irreparable misidentification.'" The court then denied Perkins's motion to exclude or suppress the evidence.

Perkins's jury trial commenced on February 16, 2015. Voir dire was unreported, but a record was made regarding the State's use of a strike against a minority juror. The following exchange occurred:

> DEFENSE ATTORNEY: We're in the process of selecting the jury in this matter. I think we've gotten down to, actually, the sixth strike, and the State, with their sixth strike, struck Juror No. 7 . . . who is of African-American heritage. And when I noticed that, I thought that it would be appropriate—or necessary, actually, to have a *Batson v. Kentucky* hearing with regard to [the State's] rationale for that strike.
> . . . .
> PROSECUTOR: Your Honor, I would, first of all, note that [the juror] is one of three African-American jurors. The other two African-American jurors are—have more education, seem to be a little older than the [struck juror]. She is, I think, the youngest member of the jury panel. I think this case requires some more maturity in age. She was very hesitant in answering questions and seemed to have some difficulty following questions concerning legal concepts.
> THE COURT: All right. Anything further, [defense attorney]?
> DEFENSE ATTORNEY: Well, I didn't find that any of her answers were objectionable. I think she was being thoughtful in trying to answer, you know, with deliberation and not make a mistake. I think she's taking the matter seriously. I certainly don't see anything to indicate that she would be unfair to either side if she were chosen to sit on this jury, so I would disagree with the prosecutor's characterization. I don't think age alone is a reason to be striking someone, is a sufficient reason to overcome the *Batson* ruling, anyway, with regard to minority jurors.
> PROSECUTOR: I disagree . . . that somehow the *Batson* ruling assures any minority member who's placed on the panel a position on the panel.
> . . . .
> THE COURT: The court has listened carefully to statements made by both parties in this matter and has brought to this analysis also the court's own impressions of the prospective juror, and the

court finds that the State has articulated a race-neutral explanation. Particularly, the court notes that the proposed juror . . . was quite hesitant in answering questions and appeared to be nervous and generally seemed to be concerned and somewhat nervous.

At trial, the complaining witness, Gabriel, testified that on July 27, 2014, he was staying at a hotel in Davenport. That day, Gabriel took King, also known as "Twin," to Wal-Mart. Gabriel helped King return some items, and then the men entered the store together to purchase some items. After leaving Wal-Mart, Gabriel and King went to a local convenience store to see if someone could help Gabriel unlock his iPhone. Gabriel was unable to find someone to help him, and the men returned to the hotel. Gabriel testified he drank a few "tall" beers and then went to sleep at approximately 10:00 p.m. in room 130—a room rented by some friends of his. Sometime later, he woke up and went outside to smoke a cigarette. When he went to grab his jacket out of his van, he found King asleep inside of it. At approximately the same time, Perkins—whom Gabriel knew as "T.T."—walked up and asked for his "cousin Twin." Gabriel showed Perkins where King was sleeping, and Perkins woke him up to come upstairs to sleep in his room—room 239. Gabriel testified that a third man was also with Perkins at the time, and the third man took Gabriel's iPhone with them up to room 239 to see if he could get it unlocked. After he finished his cigarette, Gabriel went up to room 239 to retrieve his phone and then went back down to room 130.

Sometime later, in the early hours of July 28th, Perkins and King came to room 130 looking for Gabriel. Perkins indicated that he wanted to go somewhere to shoot Gabriel's rifle, and Gabriel agreed to take the men out somewhere to do so. Gabriel testified that after they got out to the field, he loaded the rifle and

started to hand it to Perkins, when King stated that he wanted to shoot it first. After Gabriel handed King the gun, King turned and pointed the gun at Gabriel, demanding his vehicle keys and his iPhone. When Gabriel refused, King shot him in the leg. When Gabriel refused a second time, King shot him in the other leg. Gabriel attempted to wrestle the gun away from King, but Perkins pulled Gabriel away from King. Once Gabriel was on the ground, both men searched his pockets and the area around him, and ultimately took his van keys and a second cellular phone he was carrying.

As they walked away, Gabriel called 911, but he did not speak to the operator for fear that Perkins and King would hear him. When the men reached the van and realized they did not have the iPhone, Perkins shouted at King to return to Gabriel and find it. King returned and searched Gabriel again, but Gabriel had hidden the phone in some tall grass near where he was laying. Once King gave up and fled in the van with Perkins, Gabriel used his iPhone to again call 911. The second time, he was able to request help. When the first deputy arrived at the scene, Gabriel told him two people had been involved in the shooting, and their names were Twin and T.T.

In the days following the incident, Gabriel told officers that Twin had shot him, but that a second man was also involved. He referred to the second man as both T.T. and K.K. during his discussions with the police. When provided a photo array including King, Gabriel was able to immediately identify him. However, Gabriel was twice given photo arrays[2] including a picture of Perkins, and he was unable to positively identify him as the second man either time. Gabriel did point

---

[2] The photo arrays used two different pictures of Perkins.

to Perkins in the second array and told the detective that he was not "one hundred percent positive" that was the second man, but if it was not, they shared a lot of similar characteristics. Detective Ells instructed Gabriel not to circle the photograph if he was unsure, and Gabriel did not circle anyone.

One of the men staying in room 130, Dale, testified at trial. He testified that Gabriel drank six to eight "tall" beers on the evening and night of July 27th. He stated Gabriel was also taking shots of whiskey that night and had passed out in a chair outside, so Dale and one of his brothers had carried Gabriel into their room to sleep it off. Dale was in room 130 with Gabriel when King and a second man, who Dale presumed was Perkins because he had seen them together earlier, came to the door to ask Gabriel for a ride. Gabriel left with the men.

Detective Ells testified that Gabriel had mentioned room 239 to the police, so he went there on July 28th. Perkins answered the door and identified the room as his. When asked, Perkins denied knowing Gabriel or King. When Gabriel had described the second man to the detective, he stated the man was wearing a white tank top, which Perkins was wearing when he opened the door to his hotel room.

Sometime before August 20, 2014, King was arrested for his part in the incident, and he was held in jail. A phone call between King and Perkins was recorded. During the conversation, Perkins indicated that he was trying to help King with his alibi.

On August 20th, Detective Ells took the audio to Gabriel's home to see if he could identify the voice of Perkins as the second man. Detective Ells did not identify either man to Gabriel and any identification made by the individuals was

removed. Detective Ells asked, "You think you might be able to recognize his voice if I played a voice recording for you?" Gabriel indicated he might be able to, and then Detective Ells played the recording. Gabriel immediately indicated that Perkins's voice was that of the second man. He noted that he had an unusual way of pronouncing or dragging out certain words, such as "boy." Following the voice identification by Gabriel, Perkins was charged as the second man in the incident.

Sometime before February 2015, King pled guilty to robbery in the first degree, and he was incarcerated for the crime when he testified at Perkins's trial. King testified that he had been sleeping in Perkins's hotel room before the incident and Perkins and Perkins's girlfriend were still asleep when he left the room. King testified he and a guy he knew only as "Big Moe" saw Gabriel smoking a cigarette by his van and they asked him for a ride, which Gabriel agreed to give. King stated Big Moe stayed in the van while King went out in the field and shot Gabriel and King forced Big Moe to drive away with him once King had the keys and a cell phone. Additionally, officers had matched shoeprints in the field with the bottoms of the shoes Perkins was wearing at the time of his arrest; King testified he also had a pair of that brand of shoes and that he had been wearing them at the time of the shooting.

On February 24, 2015, the jury found Perkins guilty of robbery in the first degree and willful injury causing serious injury. Perkins filed a "motion in arrest of judgment or for new trial," alleging the verdicts are "contrary to and not supported by the evidence". After hearing arguments from counsel, the district court denied the motion on April 3, 2015. Perkins was sentenced to a term of

incarceration not to exceed twenty-five years for the robbery conviction and a term of incarceration not to exceed ten years for the willful-injury conviction. The two sentences were ordered to run consecutively.

Perkins appeals.

## II. Standard of Review

Each of the defendant's claims implicates a constitutional right; we review constitutional challenges de novo and independently evaluate the totality of the circumstances shown by the record. *See State v. Griffin*, 564 N.W.2d 370, 372 (Iowa 1997).

## III. Discussion

### A. Out-of-court Identification

Perkins maintains the district court should have granted his motion to suppress "all testimony concerning the alleged identification . . . following an impermissibly suggestive 'voice' identification procedure."[3] Perkins maintains that the failure to use any control recordings as well as the use of an audio that included the already-identified suspect, King, directed Gabriel to the desired conclusion. He maintains his right to due process was violated as a result.

In considering a challenge to an out-of-court identification, we use a two-step analysis. *State v. Taft*, 506 N.W.2d 757, 762 (Iowa 1993); *see also State v. Walton*, 424 N.W.2d 444, 446–47 (Iowa 1988) ("Although our prior cases have applied this balance to only visual identification procedures, we believe, and today hold, that the policies underlying the inquiry mandate its application to

---

[3] We note that Perkins did not raise a separate argument under the Iowa Constitution. Thus, we consider his claim under the accepted federal framework. *See In re J.C.*, ___ N.W.2d ___, ___, 2016 WL 1273049, at *3–4 (Iowa 2016).

voice identifications also."). "First, we decide whether the procedure used for identification was impermissibly suggestive. If we find that it was, we must then decide whether 'under the totality of [the] circumstances the suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification.'" *Taft*, 506 N.W.2d at 762 (alteration in original) (citation omitted). The critical question under the second step is whether the identification was reliable. *Id.* In considering the question of reliability, we weigh five factors:

> (1) the opportunity of the witness to [hear] the perpetrator at the time of the crime, (2) the witness'[s] degree of attention, (3) the accuracy of the witness'[s] prior description of the perpetrator, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

*Id.* at 763.

The burden is on the defendant. *See State v. Neal*, 353 N.W.2d 83, 86 (Iowa 1984) ("To succeed on this claim, defendant must establish that the procedures were suggestive and the irregularities gave rise to a substantial likelihood of irreparable misidentification in the totality of the circumstances."). If Perkins fails to meet his burden, "the identification evidence and its shortcomings or credibility are for the jury to weigh." *Id.* at 97.

Here, the district court found that even if the procedure used by Detective Ells was unnecessarily or impermissibly suggestive, Perkins could not meet his burden because "under the totality of the circumstances there is not 'a very substantial likelihood of irreparable misidentification.'"

"It is generally conceded that one-on-one confrontations or 'show ups' between an accused and an eyewitness are inherently suggestive." *State v.*

*Jackson*, 387 N.W.2d 623, 631 (Iowa Ct. App. 1986); *but see State v. Walton*, 424 N.W.2d 447–48 (Iowa 1988) (holding that a dispatcher's identification of a voice as matching an earlier caller's, where only one voice was provided and it was less than an hour after the initial call, was not an unnecessarily suggestive procedure). Here, there were two voices on the recording played by Detective Ells for Gabriel's identification, but one of the voices was of the already-identified co-defendant, who was in police custody at the time. As a one-on-one identification, the procedure was inherently suggestive.

In determining whether the identification was reliable in spite of the procedure, we consider the five factors listed above. Gabriel had plenty of opportunity to hear the perpetrator; he drove the two men to the field, engaged in a scuffle with the men during the incident, and testified about the second man, Perkins, encouraging King to return to the field to find the iPhone. Additionally, although Gabriel had been drinking alcohol and may have passed out due to intoxication sometime before the incident occurred,[4] as the district court stated, "[h]e was critically concerned and involved in the events taking place." In the call to the 911 operator, which took place immediately after the two perpetrators left the field, Gabriel can be heard speaking coherently as he explains his need for assistance. It is unclear from the record whether Gabriel made a prior description of the perpetrator's voice, but when he identified Perkins, Gabriel explained that he recognized the voice because of Perkins's word choices and the way he elongated certain words and syllables. Gabriel identified the voice as

---

[4] Gabriel's and Dale's testimony differ on whether or not Gabriel passed out due to intoxication during the evening of July 27.

belonging to the second perpetrator almost immediately after Detective Ells began playing the recording, and he sounds confident in his assertion—not hesitating or second-guessing his identification. Detective Ells played the audio for Gabriel on August 20, 2014—a little over three weeks after the incident occurred.

Here, we are persuaded there was not a substantial likelihood of irreparable misidentification. Thus, Perkins's right to due process was not violated when the district court allowed the jury to weigh the identification evidence and its shortcomings or credibility. *See Neal*, 353 N.W.2d at 97.

### B. *Batson* challenge

Perkins maintains his right to equal protection was violated when the district court found that the prosecutor's use of a peremptory strike to remove a minority juror was not purposeful discrimination.

In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prevents a prosecutor from using peremptory strikes to challenge potential jurors "solely on account of their race." The defendant bears the burden to establish a prime facie case of purposeful discrimination in selection of the jury panel. *Id.* at 96; *see also Griffin*, 564 N.W.2d at 375. To establish the prima facie case, the defendant must show (1) he is a member of a cognizable racial group, (2) the prosecutor used peremptory challenges to remove a member of a cognizable racial group from the jury; and (3) the "facts and any other relevant circumstances raise an inference that the prosecutor used the strike to exclude" the juror on the account of the juror's race. *Batson,* 476 U.S. at 96; *see also*

*Powers v. Ohio,* 499 U.S. 400, 416 (1991) (holding the defendant and the prospective juror do not have to be the same race to qualify for a *Batson* challenge). "'In determining whether a defendant has established the requisite showing of purposeful discrimination, the court should consider all relevant circumstances including, but not limited to, a pattern of strikes against [minority] jurors, as well as the prosecutor's questions and statements during voir dire.'" *Griffin*, 564 N.W.2d at 375 (citation omitted).

Once the prima facie case has been made, "an inference arises that the government violated the defendant's equal protection rights and 'the State has the burden of articulating a clear and reasonably specific' race-neutral explanation for the peremptory strike." *Griffin,* 564 N.W.2d at 375 (citation omitted). The trial court must then make a determination whether purposeful discrimination occurred. *Id.* "Because the trial court's determination of whether purposeful discrimination occurred 'will largely turn on the evaluation of credibility, a reviewing court ordinarily should give those findings great deference.'" *Id.* (citation omitted).

Here, the defendant is a member of a minority racial group and the prosecutor used a peremptory strike against a minority juror. It is unclear from the record before us whether the relevant circumstances raise an inference that the use of the strike was on account of the juror's race. Because voir dire was unreported, we are unable to "consider all relevant circumstances including, but not limited to, a pattern of strikes against [minority] jurors, as well as the prosecutor's questions and statements during voir dire.'" *See id.* We do note

that it appears at least two other minority jurors were empaneled.[5]  From this, it seems there was no "pattern" of striking minority jurors.  Additionally, striking one of three minority jurors is not sufficient, on its own, to raise the necessary inference that the prosecutor used the strike for racial reasons alone.  *See State v. Knox*, 464 N.W.2d 445, 448 (Iowa 1990) (holding that the State's exclusion of the sole minority juror was not enough to raise the inference).  However, because the district court treated Perkins's challenge as meeting the prima facie requirement, we will do the same.

Even assuming Perkins established his prima facie case, the State established a neutral, reasonable basis for challenging the juror.  The prosecutor explained that the struck juror seemed hesitant to participate and appeared to be having some difficulty with the legal concepts.  The court clearly found the prosecutor's reason to be credible, as the court echoed the  sentiments, stating, "[T]he Court notes that the proposed juror . . . was quite hesitant in answering questions and appeared to be nervous and generally seemed to be concerned and somewhat nervous."  Here, relying on the district court's credibility determination, *see Griffin*, 564 N.W.2d at 375, we find that purposeful discrimination did not occur and Perkins's right to equal protection was not violated.

---

[5] As part of the record made, the prosecutor stated to the court, "Your Honor, I would, first of all, note that [the juror] is one of three African-American jurors.  The other two African-American jurors are—have more education, seem to be a little older than the [struck juror]."

**C. Ineffective Assistance**

Perkins maintains he received ineffective assistance from trial counsel because counsel "failed to properly argue the motion for new trial." He maintains counsel incorrectly argued the sufficiency of evidence standard rather than the correct weight-of-the-evidence standard and that the district court "likely would have ruled in Perkins's favor" if counsel urged the correct standard.

A defendant may raise an ineffective-assistance claim on direct appeal if he has reasonable grounds to believe the record is adequate for us to address the claim on direct appeal. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). To prevail on a claim of ineffective assistance of counsel, Perkins must prove by a preponderance of the evidence (1) the attorney failed to perform an essential duty and (2) prejudice resulted from the failure. *See State v. Rodriguez*, 804 N.W.2d 844, 848 (Iowa 2011).

"Only in rare cases will the trial record alone be sufficient to resolve the claim on direct appeal." *State v. Tate*, 710 N.W.2d 237, 240 (Iowa 2006). We do not believe this is one of those rare cases. We prefer to preserve the defendant's claim for possible postconviction-relief proceedings. *See State v. Brubaker*, 805 N.W.2d 164, 170 (Iowa 2011) ("[I]neffective-assistance-of-counsel claims are normally considered in postconviction relief proceedings. A primary reason for doing so is to ensure development of an adequate record to allow the attorney charged to respond to the defendant's claims."). We preserve Perkins's claim. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010) ("If . . . the court determines the claim cannot be addressed on appeal, the court must preserve it

for a postconviction-relief proceeding, regardless of the court's view of the potential viability of the claim.").

## IV. Conclusion

Perkins's right to due process was not violated by the admission of the audio recording used by the complaining witness to identify him. Additionally, Perkins's right to equal protection was not violated by the prosecutor's use of a peremptory strike against a minority juror. We do not reach the merits of Perkins's claim that trial counsel provided ineffective assistance, so we preserve the claim for possible future proceedings. We affirm.

**AFFIRMED.**