# IN THE COURT OF APPEALS OF IOWA

No. 21-1606
Filed April 26, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**PHILLIP BRYANT KOROMAH, JR.,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.


A defendant appeals his conviction for first-degree murder.  **AFFIRMED.**


Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.


Heard by Vaitheswaran, P.J., Badding, J., and Doyle, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**BADDING, Judge.**

Accidents happen. At least that's what Phillip Koromah claimed after he shot his girlfriend in the head and then led the police on a high-speed chase, during which he tossed the gun out the window and called an ex-girlfriend to tell her that he was "going to prison for murder." On appeal from his conviction for first-degree murder, Koromah challenges the sufficiency of the evidence supporting the jury's verdict, alleges he was denied a fair trial because of prosecutorial misconduct or error, and claims the district court erred in overruling his *Batson* challenge to the State's removal of a black juror.[1] We affirm.

**I.     Background Facts and Proceedings**

In the early morning hours of July 23, 2020, Koromah and his girlfriend, Bethany, were headed over to a friend's house in Koromah's car when they started arguing about Bethany's methamphetamine use that night. Bethany "started kicking everything in [Koromah's] car" and "snapped the gear shifter off," disabling the car in a quiet neighborhood in Pleasant Hill. So Koromah called his best friend, Alex, for help. Alex and his girlfriend, Seirria, were drinking at their house about five blocks away with some other friends.

Seirria drove Alex's car to where Koromah and Bethany were waiting. Seirria testified that, when she got there, Koromah was calm and did not seem upset at Bethany. She started calling different places for a tow truck. Alex arrived soon after on his motorcycle. He and Koromah got into a "scuffle" because Alex was drunk and Koromah wanted him to go home. Their argument was loud enough

---

[1] *See Batson v. Kentucky*, 476 U.S. 79, 91 (1986).

that the police received a noise complaint from a neighbor. Koromah cooperated with the officers when they arrived, telling them that he was waiting for a tow truck because his gear shift was broken. The officers told Seirria to take Alex home and, believing the situation to be handled, left.

But once the officers were gone, Koromah testified that he and Bethany started arguing again. So Koromah decided that he would have Seirria wait for the tow truck and walk back to a hotel where he was staying. He gave Seirria his car key and tried to put a gun from his car into hers so that it wouldn't be found by the tow truck company. Koromah testified that Seirria yelled at him, so he stuck the gun in his waistband and walked back to the corner where Bethany was waiting.

When the tow truck operators arrived, they saw the couple on the corner, arguing. But when Koromah walked over to them, he was polite and pleasant. After asking them to tow his car to his hotel, Koromah went back to where Bethany was waiting at the corner. As the tow truck operators worked to get the car onto the truck, Seirria saw Koromah punching Bethany. One of the operators heard Seirria yelling, so he went to get his phone out of the truck to call the police.

The tow truck operator testified that as he was reaching into the truck for his phone, he heard a gunshot. He bolted upright and looked to where he heard the shot. He saw Koromah's outstretched arm, heard two more gunshots, and then watched Bethany fall to the ground. Although the tow truck operator was able to tell that Koromah's arm was straight out, like the "standard way of holding a pistol," he did not actually see a gun in Koromah's hand. He thought that Koromah and Bethany were about five to ten feet apart when the shots were fired.

The tow truck operator ran toward Bethany while dialing 911. On his way to Bethany, he passed Koromah, who was headed away from the scene. The operator testified that he saw a gun in the waistband of Koromah's pants. Koromah jumped into the car that Seirria had driven there and drove off, running over Seirria's foot in the process. The other tow truck operator chased the car as it left so that he could tell the police where it went. Both then tried to help Bethany, who was bleeding from her head, until emergency personnel arrived. Bethany was taken to the hospital, where she died hours later.

As Koromah drove off, he called his ex-girlfriend and told her that he was "going to prison for murder." He then led the police on a high-speed chase, throwing his gun and some drugs out the window along the way. Police eventually apprehended him after a deputy struck the car causing it to spin out. The gun and drugs were later recovered by the police.

A few hours after his arrest, Koromah was interviewed by an agent from the Iowa Division of Criminal Investigation.[2] During this interview, he admitted to having "backhanded" Bethany in the car when they were arguing, busting her lip open. He also admitted that when they were arguing on the corner, she tried to walk away, but he dragged her back by her hair because she was being "stubborn as hell." And he admitted to punching her, "kicking her ass" while she was on the ground, and calling her a "goofy-ass bitch." After that last insult, Koromah said that Bethany got a gun out of her backpack and aimed it at him. He told the agent that he was afraid for his life and started wrestling her for the gun, which he said

---

[2] Snippets of the video from Koromah's interview were played for the jury during the State's cross-examination of Koromah at trial.

was hers.  While they were wrestling, Koromah said the gun went off twice.  He said that he saw Bethany fall, grabbed the gun from her, and ran.

Koromah was charged with murder in the first degree.  At his jury trial in August 2021, the medical examiner testified that Bethany's cause of death was a gunshot wound to the head, and the manner of death was homicide.  The medical examiner determined that Bethany was shot from more than two feet away because she did not have any stippling,[3] which he explained only occurs "when the gun is held in a relatively close proximity."  A firearms expert testified that the gun Koromah discarded during the chase was the same one that was used to shoot Bethany and that it would have taken just over five pounds of pressure to pull the trigger.

After hearing this evidence, Koromah came up with a different story for the jury.  He testified that when he and Bethany were on the corner, he tried to break up with her.  Koromah continued:

> She told me she was going to kill me and her, because she didn't want to be without me.
> Q. What happened next?  A. She grabbed the gun from my waistband without me thinking she would, and tried to shoot me.
> Q. Okay.  A. And then wrestled the gun.  And as I finally got the gun out of her hand, my left hand was upside down, I stumbled back—she pushed me, and I stumbled back and it went off twice.

After the gun went off, Koromah testified that Bethany "was still standing there, and I turned around and ran off to the car."  He denied seeing her fall and testified that he took off because he "didn't want her to go to jail for the gun and

---

[3] The medical examiner testified that "stippling" is burnt gunpowder, "which can be deposited on the body as a black discoloration," along with gunpowder particles that "can strike the body and cause an abrasion to occur."

the shots fired." He also denied backhanding her, kicking her, or dragging her by her hair back to the corner. And while he had told the agent that the gun belonged to Bethany, Koromah acknowledged the gun was his at trial. Koromah tried to explain his different stories away by testifying that during his interview with the agent, he was tired, intoxicated, and confused from having hit his head when the deputy rammed his car during the chase.

The jury did not believe any of Koromah's stories and found him guilty of first-degree murder. Koromah filed a combined motion for new trial and in arrest of judgment, which the district court denied. Koromah appeals.

## II. Analysis

### A. Sufficiency of the Evidence

The jury was instructed that to find Koromah guilty of first-degree murder, the State had to prove all of the following elements beyond a reasonable doubt:

> 1. On or about July 23, 2020, the defendant shot [Bethany].
> 2. [Bethany] died as a result of being shot.
> 3. The defendant acted with malice aforethought.
> 4. The defendant acted willfully, deliberately, premeditatedly, and with a specific intent to kill [Bethany].

Koromah only challenges the final two elements, claiming "the State failed to prove [he] acted willfully, deliberately, premeditatedly, and with the specific intent to kill, and with malice aforethought."

We review this claim for the correction of errors at law. *See State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). A verdict will be upheld if substantial evidence supports it. *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational [factfinder] that the defendant is guilty beyond a reasonable

doubt.'" *Id.* (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). Evidence is not insubstantial just because it might support a different conclusion; the only question is whether the evidence supports the finding actually made. *See State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021).

Focusing on a jury instruction defining "willful" as "intentional or by fixed design or purpose and not accidental," Koromah argues that he "presented substantial evidence that the shooting was accidental, and the State's failure to adequately refute his theory of defense should have led to a directed verdict." To support this theory, Koromah zeros in on the testimony of the tow truck operator who witnessed the shooting. He contends that testimony was contradicted by other evidence, specifically that while the operator claimed to have heard three gunshots, the "physical evidence indicated only two shots were fired." Koromah is correct that only two casings were recovered from the scene, and only two shots were heard on a video from a nearby surveillance camera. But it's for the jury "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, [and] to weigh the evidence." *State v. Mathis*, 971 N.W.2d 514, 519 (Iowa 2022) (citation omitted).

The rest of Koromah's arguments fail under this same standard. *See Jones*, 967 N.W.2d at 343 ("While the defendant has an alternative explanation for the evidence, the jury was not required to accept the defendant's version of the events." (cleaned up)). While Koromah relies on testimony that he was "pleasant but [Bethany] [w]as yelling and argumentative" to support his claim that he did not intend to shoot Bethany, Seirria testified that she saw Koromah punch Bethany just before the shooting. And Koromah himself admitted to the agent investigating

the case that he backhanded, punched, and kicked Bethany that night. *See State v. Haskins*, 573 N.W.2d 39, 45 (Iowa Ct. App. 1997) (finding testimony that the defendant "grabbed his wife's hair and beat her head against a car previously was relevant to the issue of intent" and tended "to rebut his accidental shooting argument").

Koromah also argues the evidence shows that he "did not intend to have his gun with him and available when he walked back to" Bethany because he tried to put it in Seirria's car. But the jury was instructed that malice aforethought, deliberation, and premeditation "need not exist for any particular length of time before the act" and that "[i]f a person has the opportunity to deliberate and uses a firearm against another resulting in death, you may, but are not required to infer that the weapon was used with malice, premeditation, and specific intent to kill." *See State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001) ("[T]he use of a deadly weapon supports an inference of malice, and when accompanied by an opportunity to deliberate, also supports an inference of deliberation and premeditation."). Koromah admitted that he had the gun in his waistband when he walked back up to Bethany. And the tow truck operator testified that when he looked toward Koromah and Bethany, he saw Koromah holding his arm straight out in front of him before hearing two shots and seeing Bethany fall to the ground. *See State v. Chatterson*, 259 N.W.2d 766, 769–70 (Iowa 1977) ("[I]ntent is seldom capable of direct proof, but may be shown by reasonable inferences drawn from the facts established."); *State v. LuCore*, ___ N.W.2d ___, ___, 2023 WL 382968, at *4 (Iowa Ct. App. 2023) (same).

The fact that more than one shot was fired is another blow to Koromah's claim that the gun went off accidentally. The firearms expert testified that before the gun could be fired, "You have to load the magazine, you have to load the magazine in the gun, you have to cycle the slide, get that first round of ammunition in the gun." The safety then has to be taken off, and "then you can pull the trigger, fire the gun." Koromah admitted that he would have had the safety on since he was walking around with the gun in his waistband. "Once the gun fires," according to the expert, "you have to release the trigger, [and] pull it again for the next round that's fired. . . . Pull the trigger, release, pull the trigger, release, for every shot that's fired." The expert testified that the amount of pressure needed to fire Koromah's gun in single-action mode was "at 5-and-a-quarter pounds." This all weighs against an accidental shooting. *See State v. Sudbeck*, No. 15-0596, 2016 WL 3003407, at *3 (Iowa Ct. App. May 25, 2016) (considering a gun's safety system and the pressure required before firing as "militating against this being an accidental shooting").

The final blows to Koromah's claim are his actions after the shooting and shifting stories about what happened. *See State v. Nance*, 533 N.W.2d 557, 563 (Iowa 1995) (inferring a shooting was intentional when a defendant's conduct after the shooting conflicted with his claim that it was accidental and noting the "use of a false story could also be treated as an implied admission"). Although he denied it at trial, Koromah admitted to the agent investigating the shooting that he saw Bethany fall to the ground before he took off in his friend's car. He made no effort to call an ambulance or the police, *see id.*, although he did call his ex-girlfriend to tell her that he was "going to prison for murder." And he tried to get rid of the

murder weapon while leading the police on a high-speed chase. This is not the type of "behavior one would expect from a person who sincerely believed that [he] had just accidentally shot another person." *State v. Williams*, No. 02-1338, 2004 WL 1254130, at *4 (Iowa Ct. App. June 9, 2004); *accord Sudbeck*, 2016 WL 3003407, at *3 ("Sudbeck's testimony that he spun around, accidentally discharged his pistol with the effect of killing his girlfriend, and was so unconcerned that he never bothered to turn around to see whether he hurt anyone is so implausible that it supports an inference of premeditation.").

Simply put, we agree with the State that there was "overwhelming evidence that [Koromah] meant to kill [Bethany] when he shot her in the forehead." We accordingly reject Koromah's challenge to the sufficiency of the evidence supporting his first-degree murder conviction.

## B.    Prosecutorial Misconduct or Error

The overwhelming evidence against Koromah helps us resolve his next claim—that the State committed prosecutorial misconduct or error[4] in its rebuttal argument at the end of trial "when it disparaged defense counsel for saying the State had to prove the accidental shooting was not an accident." We review the

---

[4] The State argues that Koromah only preserved error on a prosecutorial misconduct claim, not a prosecutorial-error claim. *See State v. Schlitter*, 881 N.W.2d 380, 394 (Iowa 2016) (distinguishing between the two concepts), *abrogated on other grounds by State v. Crawford*, 972 N.W.2d 189, 197 (Iowa 2022). We reject this argument because the analysis is the same for both. *See id.* (noting the multifactor test used to evaluate prosecutorial misconduct "easily translate[s] to an evaluation of prosecutorial error"); *see also State v. Veal*, 930 N.W.2d 319, 334 (Iowa 2019) (treating a claim framed as prosecutorial misconduct "as one of prosecutorial misconduct *or error*" and analyzing the two concepts simultaneously).

district court's decision denying this claim for an abuse of discretion.  *See State v. Coleman*, 907 N.W.2d 124, 134 (Iowa 2018).

In closing argument, the prosecutor discussed the final element of the first-degree murder charge against Koromah, which required the State to prove that he

> acted willfully, deliberately, premeditatedly, and with a specific intent to kill.  That is a mouthful, but the jury instructions break it all down and define every single one of these terms for us.
> The first one is "willful."  "Willful" means intentional or by a fixed design or purpose and not accidental.
> So let's focus on that one first, because that seems to be the defendant's story in this case, that this was an accident.

The prosecutor then went through all the evidence showing "that this was not an accident."

Defense counsel also referred to the jury instruction defining "willful" in her closing argument, asserting: "The State has to prove beyond a reasonable doubt that this accident was not accidental."  In rebuttal, the prosecutor argued:

> The State must prove—and I had to write this down.  The State must prove this accident was not accidental.  Those are not my words, and I'm going to repeat it.  She said to you, "The State must prove this accident was not accidental."  Those were her words.
> I assure you, I guarantee you, go through these jury instructions, you will never see that in there.  It doesn't say the State must prove this accident was not accidental.  That's not what we are required to prove.
> Do you remember during jury selection when I said the Court tells you we have to prove three things.  Would you ask the State to prove more than they're required to prove?  The assurances were "no."  And this is why the State of Iowa asked that question, because *there are going to be lawyers like her that tell you that the State must prove this accident was not accidental.*
> *That's not the law.  That misstates what the State has to prove.  Don't fall for it.*

(Emphasis added.)

After the State finished its rebuttal argument, defense counsel asked for a sidebar. The court then reminded the jury of the admonition they had received before closing arguments: "that the statements and arguments of the attorneys are not the statements of the law, rather the instructions are the statements of the law that you are to follow." Once the jury was released to deliberate, the court made a record with the parties about the sidebar, at which defense counsel argued that the prosecutor "stated that I purposefully misled the jury on the law. He also stated 'lawyers like her.' This is a personal attack accusing me, in front of the jury, that I misled them about the law. That is extremely prejudicial to our client." She asked the court to either bring the jury's attention to the instruction defining willful to mean "not accidental" or grant a mistrial.

The court did neither, instead finding "the renewed admonition and the admonition given prior to closing statements were sufficient in this instance." In its ruling on Koromah's motion for new trial, where Koromah renewed his claim of prosecutorial misconduct, the court found that "even if the statements were misconduct, they were not prejudicial." We agree. *See State v. Plain*, 898 N.W.2d 801, 818 (Iowa 2017) ("In order to establish a violation of the right to a fair trial, a defendant must show both (1) error or misconduct *and* (2) prejudice." (emphasis added)).

"In determining whether misconduct is so prejudicial as to warrant a new trial," five factors are assessed: "(1) the severity and pervasiveness of misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; [and] (5) the extent to which the defense invited the

misconduct." *Coleman*, 907 N.W.2d at 140 (citation omitted). Prejudice is generally found "where the prosecutor has demonstrated a persistent effort to present prejudicial information to the jury." *Id.* That is not what happened here.

The claimed misconduct or error was limited to the rebuttal argument. In the initial closing argument, the prosecutor quoted the jury instruction defining willful as "not accidental" and accurately laid out the State's burden of proof on that issue. *See id.* ("[P]rosecutorial misconduct will not normally rise to the level of a due process violation when it occurs in isolation."). While the challenged conduct did go to a central issue in the case—whether the shooting was intentional or accidental—the State's evidence against Koromah was strong as discussed above. *See id.* at 141 ("The most important factor in our determination of whether any prosecutorial misconduct rose to the level of prejudice to demonstrate a due process violation is the strength of the State's evidence."). And after the State's rebuttal argument, the court reminded the jury that the attorneys' arguments were "not the statements of the law, rather the instructions are the statements of the law that you are to follow." This same concept was embodied in the jury instructions, which directed the jury to base its "verdict only upon the evidence and these instructions" and instructed them that "[s]tatements, arguments, questions, and comments by the lawyers" were not evidence. *See State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010) ("We presume juries follow the court's instructions.").

On the whole, while we do not approve of the prosecutor's critique of defense counsel, he "stuck to the evidence, facts, and legal arguments while presenting the case to the jury." *Coleman*, 907 N.W.2d at 141. After assessing all the factors bearing on the question, we find Koromah failed to show the necessary

prejudice to demonstrate that his due process rights were violated. We accordingly find no abuse of discretion in the district court's decision denying him a new trial on this ground.

### C. *Batson* challenge

This leaves us with Koromah's *Batson* challenge, which was made after the State used a peremptory strike on a potential juror who identified himself as black on his "panel bio form." The district court overruled Koromah's challenge, finding "that the defense has failed to establish that counsel was using the strike to engage in purposeful discrimination, even if a prima facie case was made." We review this ruling de novo, though "we give 'a great deal of deference to the district court's evaluation of credibility when determining the true motives of the attorney when making strikes.'" *Veal*, 930 N.W.2d at 327 (citation omitted).

Under *Batson*, "[p]urposeful racial discrimination in selection of [a jury] venire violates a defendant's right to equal protection." 476 U.S. at 86. "The Equal Protection Clause 'forbids the prosecutor to challenge potential jurors solely on account of their race.'" *State v. Williams*, No. 21-1772, 2022 WL 16985147, at *1 (Iowa Ct. App. Nov. 17, 2022) (quoting *Batson*, 476 U.S. at 86). A *Batson* challenge follows three steps. First, the defendant must make a prima-facie showing that the State used its peremptory challenges to exclude prospective jurors on the basis of race. *State v. Knox*, 464 N.W.2d 445, 448 (Iowa 1990). Second, the burden shifts to the State to provide "a clear and reasonably specific and neutral explanation for the peremptory challenge." *Id.* And third, the court must decide whether purposeful discrimination exists based on the reasons presented by State. *Id.*

Koromah contends that he "provided a prima facie case of purposeful discrimination by pointing out the State's strike of one of only two black jurors on the panel despite the lack of any disqualifying factors."  The State does not challenge that point, skipping instead to the second step in arguing that the court "properly determined that the State offered a race-neutral reason for striking" the challenged juror.  Focusing then on that step, we turn to the record made during jury selection.  *See State v. Mootz*, 808 N.W.2d 207, 215 (Iowa 2012) ("The prima facie case requirement . . . becomes moot when the party attempting to strike a juror offers a race-neutral explanation for the peremptory challenge.").

The following exchange took place during defense counsel's voir dire of the challenged juror:

> [DEFENSE COUNSEL]: I know Black Lives Matter, All Lives Matter, Back the Blue has been, you know—we've heard about it for two years now.  It's been very active in our community.  We've had protests, you know, and there's been a lot of conflict in our community over it. . . .
> Anyone . . . with the issues that we have going on in our community, feel like you can't be on a jury for someone who's been accused of a crime who is black?
> No.
> How about you just don't trust the police force?  Anyone in that camp?
> I'll mark that down.
> All right.  Mr. [P.], can you give me an answer?
> PROSPECTIVE JUROR [P.]: Same. I don't trust the police. Yeah, I don't.
> [DEFENSE COUNSEL]: Okay.  Do you think that police officers—would you be able to—if you were picked—if you were picked to be on this jury, be able to decide their credibility based on the testimony?
> PROSPECTIVE JUROR [P.]: Yeah.  I would base it off of their testimony.
> . . . .
> [DEFENSE COUNSEL]: So you feel like you could be fair and impartial to the police officers who are called?
> PROSPECTIVE JUROR [P.]: Yeah.

After Koromah objected to the State's strike of this juror, the State argued:

> If the Court would remember, I asked a very specific question, which is, "Is there . . . a question I'm not asking you that you believe we should know that would not make you a good juror?" He didn't respond to that question, obviously, and we concluded.
> When we sat down, the defense got up. They addressed . . . the issue of race again, and then at some point, he said, as clear as day, "I do not trust police."
> . . . .
> We do have quite a few law enforcement officers that are going to be witnesses in this particular case, and, again, the gentleman stated he does not trust police. Those are powerful words, and I know counsel did a very good job of trying to rehabilitate him, but you have to take in the context that they now know what's the right thing to say if you want to still stay on this jury. For that reason, Your Honor, we believe it's a race-neutral reason.

The district court agreed, finding "the reasons provided by counsel for the requested strike were plausible and reasonable and provide a legitimate ground for counsel to form an opinion that the prospective juror was objectionable." Koromah challenges this finding, arguing that "[s]triking potential jurors who express concern about police conduct—not based on their personal experiences but based on information they receive through the media and elsewhere—sweeps too broadly."

It's true that the challenged juror denied having any personal life experiences that would make him biased one way or another. So the State's reliance on appellate cases that "have repeatedly noted that a juror's interactions with law enforcement and the legal system are a valid, race-neutral reason for a peremptory challenge" loses some of its force. *Mootz*, 808 N.W.2d at 219 (discussing a potential juror who was struck by the defense because counsel "didn't like the way he said that when he was arrested, that he deserved it"); *accord*

*Veal*, 930 N.W.2d at 334 (finding "a prosecutor's use of a peremptory strike on a juror because the same prosecutor had sent her father to prison for the rest of his life" was a valid, race-neutral reason for rejecting the *Batson* challenge); *State v. Griffin*, 564 N.W.2d 370, 376 (Iowa 1997) (affirming district court's rejection of a *Batson* challenge where the State struck two black jurors because they "had served on previous juries that convicted on lesser-included offenses").

Koromah also argues that a prosecutor "could use distrust of the police or support for the Black Lives Matter movement as an acceptable proxy for race." Our supreme court acknowledged a similar concern in *Veal*, 930 N.W.2d at 334, where it noted "the disproportionate impact when jurors can be removed based on prior interactions with law enforcement." *Accord State v. Miller*, No. 16-0331, 2017 WL 1088104, at *3 (Iowa Ct. App. Mar. 22, 2017) ("A significantly higher percentage of people of color have arrest records due to the disproportionate number of stops, searches, and arrests of people of color." (quoting Vida B. Johnson, *Arresting* Batson: *How Striking Jurors Based on Arrest Records Violates* Batson, 34 Yale L. & Pol'y Rev. 387, 389 (Spring 2016)). But the district court, who had a "ringside seat for jury selection," did not think that's what happened here. *Williams*, 2022 WL 16985147, at *4. We agree, given the "great deference" afforded to the court in making these determinations. *Knox*, 464 N.W.2d at 448.

As was the case in *Williams*, which involved the strike of a multiracial juror whose fiancée had a "less-than-positive experience" interning for the county attorney, our conclusion is bolstered by earlier interactions during jury selection. 2022 WL 16985147, at *4. Consistent with its strike of the challenged juror, the prosecutor also struck a juror who said that she had been "somewhat involved

in . . . social justice issues" and that she knew some police officers and disagreed "with them on some things." That juror did not identify herself as black or multiracial. *Cf. Miller*, 2017 WL 1088104, at *4 (determining that a "side-by-side comparison of the response of the stricken black juror with that of the two nonblack jurors who were eventually empaneled" undermined the reason given by the State for striking the juror). The State also left the other black potential juror on the panel seated for Koromah's trial. *Cf. id.* at *4 (finding the State's use of two of its peremptory strikes to remove the only two black potential jurors was racially motivated). And the prosecutor spoke at length with the potential jury members during his voir dire about the need to set aside "some of those societal . . . issues— race, police, all that stuff" so that Koromah would be judged fairly and impartially.

With all this in mind, we find the reason given by the State for its strike of the challenged juror was race-neutral and not a pretext to strike a black juror. We accordingly affirm the district court's denial of Koromah's *Batson* challenge.

## III. Conclusion

We affirm Koromah's conviction for first-degree murder, concluding the jury's verdict was supported by substantial evidence, Koromah was not prejudiced by any alleged prosecutorial misconduct or error, and the district court did not err in denying his *Batson* challenge.

**AFFIRMED.**