# IN THE COURT OF APPEALS OF IOWA

No. 19-1680
Filed April 14, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**MAJESTIC ALEXANDER MALONE,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Des Moines County, Mark E. Kruse, Judge.

Majestic Malone appeals his convictions for second-degree murder and third-degree kidnapping. **AFFIRMED.**

R.E. Breckenridge of Breckenridge Law P.C., Ottumwa, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester and Scott D. Brown, Assistant Attorneys General, for appellee.

Considered by Tabor, P.J., May, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**POTTERFIELD, Senior Judge.**

Someone beat Edward Breuer—five foot seven inches and 114 pounds—to death on March 17, 2019.  When police responded to a 911 call, fifteen-year-old Owen said he found Breuer in his house and had hit him.  After an investigation and a several-day trial, co-defendants Majestic Malone and Markell Price were convicted of second-degree murder and third-degree kidnapping.  In this appeal, Malone asserts the court abused its discretion in denying his motion for a new trial on the ground the verdict was against the weight of the evidence.  He also contends the district court erred in rejecting his *Batson* challenge[1] to the State's use of a peremptory strike.  Because the evidence does not preponderate heavily against the verdicts and because we give great deference to the district court's finding that the State's race-neutral reasons were not pretext, we affirm.

**I. Background Facts.**

Viewing the evidence in the light most favorable to the State, trial evidence shows teenaged brothers Owen and Evan[2] were in the process of moving the remainder of their family's belongings from their old apartment on Leebrick to their new address at the corner of Acres Street and Elm Court.[3]  On the afternoon of

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) ("Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." (citation omitted)).

[2] We will refer to minors by their first names only.  The teens' mother was out of town, and their father was incarcerated.

[3] The address of the new apartment was 404 Acres Street.  Acres Street runs east and west and intersects with Elm Court, which is a one-lane alley running north

March 17, Evan arrived at the new apartment in a red Jeep. Owen received a telephone call that the new apartment had been broken into.

Around 4:00 p.m. that day, Landon Duerre took his dog for a walk. When Duerre reached the end of his sidewalk on Louisa Street,[4] which intersects Elm Court to the north of Acres, Breuer approached him and asked for some money. Duerre did not give him any money, but he stood and spoke with Breuer about his dog for a couple of minutes. While they were speaking, a man—later identified as Stanley Baldwin—came "from a house a little way down the road, asking if [Breuer] had just come from the house." Duerre started to walk back to his house, and Breuer followed. Duerre said Baldwin "sounded threatening" toward Breuer. When Duerre reached the steps of his house, he heard "a thud" and saw Breuer on his hands and knees, "like he was just getting back up." At this time, Breuere was conscious and Baldwin had his hand under Breuer's armpit and was "walking back the opposite direction."

When Evan arrived at the Acres apartment, he did not see anyone either inside or outside the apartment. Several minutes later, Evan saw family friend Baldwin walking on Elm toward the apartment, holding Breuer by the shirt. Baldwin accused Breuer of breaking into the apartment, which Breuer denied. Evan described Breuer as "scared."

Owen asked his friend, Brad, to drive him to the Acres apartment. Brad and his girlfriend, Gracie, drove Owen to the new apartment and noted Owen was very

---

and south; garages line the east side of Elm. The entry to the new apartment was on Elm Court.
[4] Like Acres, Louisa Street runs east and west.

angry. Brad pulled around the corner on to Elm and parked the red pickup in front of the apartment. Owen got out, but Brad and Gracie remained in the pickup.

When Owen arrived at the apartment,[5] Evan and Baldwin were standing on the hill in front of the apartment and Breuer was sitting on the ground. Owen said Breuer appeared "nervous." Baldwin and Owen questioned Breuer, demanding to know what he had taken from the apartment. At one point, Breuer got up and ran north on Elm away from the apartment. Baldwin told Owen to "go get him." Owen chased Breuer, knocked him to the ground, and hit him in the back of his head a number of times. Owen ordered Breuer back to the apartment. In the process, Owen pushed Breuer to the ground at least one more time and hit him in the head. Owen grabbed Breuer's arm, directed him back to the apartment, and pushed him to sit on the grass. Owen testified his punches did not cause Breuer to bleed.

Baldwin told Owen to grab a bat. Ten minutes after Owen arrived at the apartment, the neighbors' surveillance cameras show Owen on the porch picking up a long red bar. Baldwin ordered Breuer to place his hand on the ground and then Baldwin slammed the metal bar down on Breuer's hand, breaking and cutting his finger, causing him to bleed. Baldwin told Owen to call Price.[6] Owen testified he called Price and told him somebody broke into the house and he needed to get there. Price told Owen to have Evan pick him up.

---

[5] The apartment was on the second floor of the building. Brothers Jeff and Scott Rechkemmer and another man lived in the apartment on the first floor.
[6] Owen testified Baldwin had been asked to check in on him and Evan and that Price was also a friend of the family and had property at the Acres address that belonged to him.

Approximately twenty-five minutes after Owen is seen on the porch picking up the bar, Evan is seen driving away in the red Jeep. Evan returned to the Acres apartment with Price. Malone arrived at the same time in a red SUV driven by an unknown individual. Owen approached Price and made swinging motions with his arm. Price and Malone walked to the yard, which faced Elm. According to Owen, Baldwin told Price and Malone to take Breuer inside. Owen went into the apartment to lock up the family dog because the dog did not like Malone. Owen testified that as he was coming down the stairs, he passed Malone, Price, and Breuer walking up the stairs. Breuer was between or in front of the two bigger, younger men, and they were touching Breuer. Once Breuer reached the doorway to the apartment at the top of the stairs, Malone hit Breuer "really hard" in the jaw, and Breuer "flew back into the doorway to the kitchen and then fell onto the cabinet and collapsed on the cabinet." Owen stated he then saw "arms flying, but I don't know who was hitting what." Owen, Evan, Brad, and Gracie all testified Breuer was carried out of the apartment and dumped on the ground. Owen testified Breuer was bleeding and his "face was messed up . . . like he got beat in a fight." Price poured soda on Breuer's head,[7] but he appeared unconscious and was not moving much.

Evan is seen on the surveillance video placing the red bar on the porch. About two minutes later, Price, Malone, Baldwin, and Evan can be seen conferring at the corner of Elm and Acres. Within eight minutes of arriving at the apartment, Evan and Price leave in the Jeep and Malone leaves in the red SUV. Brad and

---

[7] Owen testified Price had not brought the soda with him but had "got that from my house."

Gracie were also leaving at the same time, having been told by Owen they would not be moving anymore that day.

Several minutes later, Owen and Baldwin are in view. Baldwin picks up the red bar from the porch and places it into the back of his white van and then he, too, drives away. Owen testified that before he left, Baldwin told Owen to "put blood on [his] hand and take the fall." Owen said he complied because he "didn't wanna give anybody's names out." After Baldwin left, Owen called 911 to report he may have killed someone who had broken into his apartment.

Law enforcement and medical personnel arrived in minutes. Owen gave several different statements to his aunt, his mother, his father, his girlfriend, and police investigators. In each, Owen says he discovered Breuer in the course of breaking into the apartment and he either assaulted Breuer or Breuer first assaulted him and he acted in self-defense. Upon learning Breuer had died, Owen told the investigating officer that Baldwin had hit Breuer in the hand and head with the pipe. When the officer left the interview room, Owen told his aunt he would "take the fall for Stanley as long as [he] could." When the officer returned, Owen told a fifth version, saying that after Baldwin struck Breuer several times, he called Price, and then told Owen to rub blood on his hands and tell police the story about finding the intruder. Breuer's blood was found on Owen's clothing and shoes.

After further investigation, Baldwin was charged with willful injury, and Malone and Price were charged with first-degree kidnapping and first-degree murder. Malone and Price were tried together.

During jury selection, all but four of the venire members were white. The State used its tenth peremptory challenge to strike one of the persons of color,

which the defense challenged as "improper and violates *Batson*." In response, the prosecutor stated:

> The first thing the defense would need to establish under *Batson*, and all the cases that follow it, is that there's a pattern that we've established taking off jurors or excusing them by a peremptory strike. We've not done that.
> There's actually other minority jurors that are on the panel . . . .
>
> . . . .
>
> . . . We are not striking either one of those jurors. This is one minority juror that we are taking off, so there's not been any type of pattern established. I would assume, if we would have taken [Juror 29] and [Juror 28] along with [S.M.], that pattern might have been established. Even if we had taken one of those other two, given the fact there's only three total on the panel, *Batson* and its—and the cases that follow it do not prevent the State from striking a minority juror, so there—the test can't be established on the first prong.

The prosecutor provided a number of race-neutral reasons for striking S.M.:

> One, [S.M.] indicated during our record back in chambers yesterday that she was on the previous case, . . . that happened here a couple of weeks ago. One of the oddities of her statement that she made was that she originally was the jury foreman on the case, then backed off and then let somebody else take over. . . . [T]his case is longer, there are more complicated issues.
> We're concerned about her being able to make a decision on this case and being able to be in a position where she could make a decision on this case, particularly whenever she stepped back from being foreman. I've never heard of that before. I thought that was very much of an oddity and we would want to strike her for that reason.
> The other thing is I'd asked—made a record earlier today concerning jurors that work third shift and whether or not they were going to be able to work during jury service. There are two of them that indicated they work third shift. . . .
> Just observing [S.M.] out in the courtroom, Ms. Schaefer and I both observed that she has her eyes closed at times. She appears tired to me. I don't know how anyone can be on a three-week trial and try to work third shift and then still come in and where we can expect them to pay attention . . . .
> There are a couple of others. . . . I mean, she wears these kind of odd shirts that express her opinion. I don't know. It's just a bit of a concern that she would kind of be out there doing that.

And the last reason is that in the last case, whenever she was interviewed or talked to during jury selection, she was emphatic about defendants testifying and that they had to do that in order to convince her of whatever it was she needed to be convinced of.

The district court denied the *Batson* challenge, stating it was "not sure whether a prima facie case has been made" but found the State had offered race-neutral reasons. During the challenge-for-cause phase, the defense successfully challenged one venire member of color who had personal knowledge of the victim and indicated that she could not be fair and impartial in this case. Two jurors of color served.

The jury convicted Malone and Price of lesser-included offenses of second-degree murder and third-degree kidnapping. Malone filed a motion for new trial, contending the verdicts were contrary to the evidence and the court improperly overruled the defense's *Batson* challenge to juror S.M. The court overruled the motion for new trial, and Malone appeals.

## II. Scope and Standards of Review.

We review the denial of a motion for new trial on weight-of-the-evidence grounds for abuse of discretion. *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). We review a claim of racial discrimination in the use of a peremptory strike de novo. *State v. Veal*, 930 N.W.2d 319, 327 (Iowa 2019).

## III. Discussion.

*A. Weight of the evidence.* "The weight-of-the-evidence standard requires the district court to consider whether more 'credible evidence' supports the verdict rendered than supports the alternative verdict." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016) (citation omitted). When considering the weight of the evidence, the

court may "grant a motion for new trial only if more evidence supports the alternative verdict as opposed to the verdict rendered." *Id.* "The question for the court is not whether there was sufficient credible evidence to support the verdict rendered or an alternative verdict, but whether 'a greater amount of credible evidence' suggests the verdict rendered was a miscarriage of justice." *Id.* (citation omitted). Because "a motion for new trial brought under the weight-of-the-evidence standard essentially concedes the evidence adequately supports the jury verdict," the trial court "may invoke its power to grant a new trial on the ground the verdict was contrary to the weight of the evidence only in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *Id.* (citations omitted).

Here, the State's case against Malone relied largely upon the testimony of Owen. The trial court ruled:

> Regarding the evidence of the—contrary weight of the evidence standard, the court does look at—the jury had a lot of things to consider in this particular case. They resolved differences in testimony and made credibility determinations of witnesses as set forth in the jury instructions. In looking at all the evidence presented in this case, the court cannot find that the verdict was contrary to the weight of the evidence. There's nothing about the decision reached by the jury that's so inconsistent with the evidence presented that it would lead the court to find that the verdicts were not supported by the weight of the evidence.

We agree with the district court that this is not "the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *See id.* The court did not abuse its discretion in denying the motion for new trial on this ground.

*B. Batson challenge.* "In *Batson* the United States Supreme Court held that the equal protection clause of the fourteenth amendment prevents a prosecutor from using peremptory strikes to challenge potential jurors 'solely on account of their race.'" *State v. Griffin*, 564 N.W.2d 370, 375 (Iowa 1997) (quoting *Batson*, 476 U.S. at 89).

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

*State v. Mootz*, 808 N.W.2d 207, 215 (Iowa 2012) (citation omitted).

To establish a prima facie case, Malone must show (1) he is a member of a cognizable racial group, (2) the prosecutor used peremptory challenges to remove a member of a cognizable racial group from the jury; and (3) the "facts and any other relevant circumstances raise an inference that the prosecutor used the strike to exclude" the juror on the account of the juror's race. *See Batson*, 476 U.S. at 96; *see also Powers v. Ohio*, 499 U.S. 400, 416 (1991) (holding the defendant and the prospective juror do not have to be the same race to qualify for a *Batson* challenge).

We review *Baston* claims de novo but "give 'a great deal of deference to the district court's evaluation of credibility when determining the true motives of the attorney when making strikes.'" *Veal*, 930 N.W.2d at 327 (quoting *Mootz,* 808 N.W.2d at 214).

Here Malone argues,

each of the reasons given by the State were a pretext to justify the exclusion. Malone would also argue that change in the current law is required. The current law requires the trial judge to make an impossible choice. To reject the reasons given as not being race neutral places the judge in the position of charging a local prosecutor with lying and having racial motivations.

On appeal, Malone asserts that S.M.'s "only fault appears to be she wore a cat t-shirt and the prosecutor is a dog person."[8] This is contrary to the record before us. The prosecutor noted the juror's recent service and that S.M.'s willingness to give up the foreperson job was odd. The prosecutor believed this might impact S.M.'s ability to render a verdict in this case, which would be a longer and more complex case. The prosecutor also noted S.M.'s late-night work shift, which appeared to leave her less than alert in the court room. These are race-neutral reasons.

The district court ruled:

Race-neutral reasons were given for the strike by the State which were accepted by the court. There was extensive voir dire in the case with every potential juror being individually questioned. It should be noted that the defense also struck an African American juror and there were two African American jurors on the jury. There certainly was no pattern of exclusion by the State, and the opposite can be inferred.

We defer to the court's finding that the race-neutral reasons were not pretext. *See id.* at 334.

---

[8] While it has been said that "the state's justification offered in *Batson's* step two need not be persuasive and can be frivolous or utterly nonsensical," *Veal*, 930 N.W.2d at 359 (Appel, J., concurring in part), if in fact the potential juror's shirt was the only reason given by the State, our analysis would be different because a reason must be "race neutral and '*related to the particular case to be tried.*'" *Id.* at 334 (emphasis added).

As for the defense's assertion that "change in the current law is required," this argument is directed at the wrong branch of government.

**AFFIRMED.**