# IN THE COURT OF APPEALS OF IOWA

No. 22-1139
Filed November 21, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DAVID ROBERT JOHNSON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Wapello County, Joel D. Yates, Judge.

A defendant appeals his convictions and sentences for sexual abuse, neglect or abandonment of a dependent person, lascivious acts with a child, and incest. **CONVICTIONS AFFIRMED, SENTENCES AFFIRMED IN PART AND VACATED IN PART, AND REMANDED FOR RESENTENCING.**

Martha J. Lucey, State Appellate Defender, and Josh Irwin, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Considered by Greer, P.J., and Schumacher and Badding, JJ.

**BADDING, Judge.**

David Johnson was convicted by a jury of nineteen crimes stemming from sexual abuse of his daughter and niece. On appeal, Johnson claims (1) the district court abused its discretion by denying his motion to sever the charges involving his daughter from the ones with his niece; (2) the court erred in overruling his objection to the State's use of its peremptory strikes to excuse men from the jury panel; (3) insufficient evidence supported two of his convictions for third-degree sexual abuse; and (4) the court failed to give sufficient reasons for imposing consecutive sentences. We affirm Johnson's convictions but vacate his sentences in part and remand for resentencing.

**I.      Background Facts and Proceedings**

Johnson and his wife, Kimberly, separated in November 2014 after fourteen years of marriage. They had two children together—a son, born in 2002; and G.J., a daughter, born in 2008. Kimberly was also close to her niece, K.H.M. Growing up, K.H.M. said that she was at the Johnsons' house all the time, often spending the night. That stopped in June 2010, when K.H.M. was fourteen years old and just finishing eighth grade.

On June 2, Johnson called Kimberly while she was at work and said, "I think I have been doing bad things to [K.H.M.]; I've been touching [K.H.M.]; and I just went to the therapist, and he's calling the cops while I'm going to go to the police station, but I'm going to run my truck into a tree first." Johnson made it to the police station, where he reported that the night before, "he stuck his hands down [K.H.M.'s] pants and touched her vaginal area." He also said that he "tried to insert

his penis inside of her vagina . . . but was unsuccessful." Johnson blamed his actions on taking Ambien, a sleep medication.

K.H.M. was pulled out of school and taken to the police station. Walking in, she saw her aunt and mom, "all of them being there crying." She "got really scared and clammed up" when law enforcement questioned her about Johnson. And she denied any abuse during a later interview at a child protection center. As a result, the charges that had been brought against Johnson were dismissed.

Kimberly and Johnson reconciled two or three months later. Kimberly explained: "I was kind of convinced that [he] was innocent because his lawyer had convinced us all that—because he was on Ambien, that it really didn't happen; he was hallucinating." So the couple "went on with life as normal," until November 2014 when they separated. Kimberly testified their separation was triggered by K.H.M.'s decision to tell her what really happened in June 2010.

At trial, K.H.M. testified:

> We were in [G.J.]'s room . . . and he—I was—I peed the bed [Johnson] said. So he was taking my pants off, and I woke up, and he gave me some medicine, and he said he was just changing me. Well, then I remember him pulling his penis out and putting it on top of my vagina and just kind of rubbing it.

The next morning, K.H.M. remembered Johnson kept saying, "I'm going to hell; I'm going to hell." She also testified about another time when Johnson "got his penis out and told me to pat it, that it won't hurt me," but she couldn't remember how old she was then. And she talked about Johnson having her "pop his back" in his bedroom, at least every other month until June 2010:

> He would always tell me to come in and pop his back when my aunt was at work, and he would be laying on the bed, and it would start out he would have me pop his back, and then he would usually flip

me over or either go on top of me or something in that general—It was just always about the same.

K.H.M. would sometimes feel his hard penis rubbing against her during these back-popping sessions. She distinctly remembered another time when they were leg wrestling, and Johnson flipped her over on top of him. K.H.M. said that she could "actually feel him, like, putting pressure on me," with his "penis against my vagina area." She thought that happened when she was in middle school and "between ten, thirteen, fourteen" years old.

After K.H.M.'s disclosure, Kimberly would not allow Johnson to have contact with their children until he saw a therapist. He eventually progressed to unsupervised visits every other weekend, with Kimberly explaining: "I just had this false sense of security because he lived right next door, so I thought he knows I can pop in whenever I want."

In March or April 2020, Kimberly became concerned about G.J.'s mental health. She started isolating herself from everyone and wearing hoodies with long sleeves, even when it was hot outside. G.J. cut her "hair really different," and then in June or July, she told Kimberly that she was gay. About one month later, Kimberly saw cuts on G.J.'s arms. She decided to take G.J. to a therapist, which Johnson was against. He told G.J. "they just want to get your secrets out." And after he found out that G.J. was cutting herself, Johnson asked her "if it was because of what he was doing." When G.J. said yes, he started crying and saying he was going to hell.

Kimberly's concern for her daughter intensified after she talked to a friend who had been molested and used to cut herself: "I was like, oh, my gosh, she has

this history, and she's cutting." Kimberly pulled G.J. out of school that day, and they had a long talk, during which G.J. finally told her what her father had been doing to her since she was five or six years old.

G.J. testified that when she had visits with Johnson, she would sleep on the couch in the living room. Though it was "kind of fuzzy," G.J. remembered the abuse started with Johnson having her go into his bedroom for massages at night. Eventually, he began taking her clothes off and sometimes his own. G.J. testified that Johnson would slide his penis back and forth between her thighs. He would also press his penis against her vagina and anus, and he grabbed her vagina and buttocks with his hands. G.J. testified that Johnson tried to put his penis in her vagina a few times, but it wouldn't go in. But when she was in fourth or fifth grade, he did insert his penis into her anus. Johnson also had her put her mouth on his penis a few times, and he ejaculated on her stomach one time when she was sitting on the couch. G.J. said that she "never questioned [his behavior] really," until she got older and realized it was not right.

After G.J. told her mother what her father had been doing, Kimberly took her to the police station. A criminal investigator from the county sheriff's department went to Johnson's home in September 2020 to interview him about the allegations. Johnson admitted that most of what G.J. described had happened, but he blamed it on her. He told the investigator that when G.J. was nine or ten years old, he would wake up to her doing things to him, like taking his penis out and rubbing it on herself or putting it in her mouth and anus. Johnson told her that he "knows it feels good," but he could go to jail for it. He admitted to the investigator "this all looks terrible" and acknowledged it was wrong.

Johnson was charged by trial information with four counts of sexual abuse in the second degree, three counts of sexual abuse in the third degree, four counts of neglect or abandonment of a dependent person, four counts of lascivious acts with a child, and four counts of incest. The three counts for third-degree sexual abuse involved K.H.M.; the rest were for G.J. One week before the jury trial in April 2022, Johnson moved to sever the charges naming K.H.M. as the victim from the ones naming G.J. The district court denied the motion, and the case proceeded to trial with COVID-19 protocols in place for jury selection.

Those protocols included conducting voir dire with the jury panel divided into three groups.[1] The court excused each group after the attorneys were done with their questions, telling the members: "You can leave the courthouse and go back to your daily lives. You will receive a call from someone on our staff yet today, and, again, one way or the other you will get a call whether or not you have been selected as a juror or not."

After the last panel was sent home for the day, the parties exercised their peremptory strikes on the record.[2] When the last strike was made by defense counsel, the court directed its attendant to "read into the record the 12 jurors and the 2 alternates." Before she did so, defense counsel interjected, telling the court that he had a *Batson* objection to make.[3] The court responded, "We'll get through

---

[1] *See State v. Booker*, 989 N.W.2d 621, 627 n.3 (Iowa 2023) (describing the "modified COVID-19 pandemic measures," which "required limiting the number of people in a courtroom, which in turn necessitated splitting voir dire into smaller, separate groups").

[2] The State and defense were each given six strikes, plus one extra strike to end up with two alternates. *See* Iowa R. Crim. P. 2.18(9), (15)(a)(2).

[3] *See generally Batson v. Kentucky*, 476 U.S. 79 (1986).

this, and then you can do it." The attendant then read the names of each juror with their number, following which the court asked the attorneys whether they "agree[d] those are the 14 jurors?" They both said yes. The court continued: "We need to start reaching out to these people and telling them. Again, I'll begin . . . with telling them to be in the jury room at 8:30 tomorrow, with the understanding we would start at 8:45. How does that strike the State?" The prosecutor responded, "That sounds great." And when the court turned to defense counsel, he answered, "I can be ready, Your Honor."

Though it's not entirely clear from the record, the court then seemed to direct its next comments to its attendant: "Okay. So permission granted, and we can start reaching out to the 14 to report in [at] 8:30, and the—notify the others that we appreciate them being here but they were not selected. Okay?" With that done, the court turned back to defense counsel for his objection. Counsel replied:

> Your Honor, . . . we would issue a *Batson* challenge through the State's strikes. Of their 6 strikes, 5 of them were male. We believe that they have selected those with a gender bias to have . . . as much of a female jury as possible for the two female victims against a male Defendant.

The State resisted, arguing that the challenge should have been "done in tandem with the strike" so that a nondiscriminatory reason could be given. The court took the objection under advisement, denying it the next morning after the jury was sworn in and opening statements were made.

After the State rested, and again at the close of all evidence, Johnson moved for a judgment of acquittal. The court denied the motions, and the jury found Johnson guilty of all nineteen charges. At Johnson's sentencing hearing, the State requested the prison sentences for each conviction to run consecutively,

for a total "of about 140 years," while defense counsel asked for concurrent terms. The court decided to run three of the counts consecutively to one another, for a total term of imprisonment not to exceed forty years.

Johnson appeals, raising challenges to each stage of the trial from the denial of his motion to sever, the rejection of his challenge to the State's peremptory strikes, the sufficiency of the evidence supporting two of his nineteen convictions, and the imposition of consecutive sentences.

## II.    Analysis

### A.    Motion to Sever

For his first claim on appeal, Johnson contends the court abused its discretion in refusing to sever the counts involving G.J. from the counts involving K.H.M. into two trials.  We review this claim for an abuse of discretion.  *See State v. Elston*, 735 N.W.2d 196, 198 (Iowa 2007).

Under Iowa Rule of Criminal Procedure 2.6(1) in effect at the time,

> Two or more indictable public offenses which arise from the same transaction or occurrence or from two or more transactions or occurrences constituting parts of a common scheme or plan, when alleged and prosecuted contemporaneously, shall be alleged and prosecuted as separate counts in a single complaint, information or indictment, unless, for good cause shown, the trial court in its discretion determines otherwise.

"The goals of the rule are 'judicial economy and allowing prosecutors more leeway in charging multiple offenses.'"  *See State v. Crane*, No. 21-0532, 2022 WL 951075, at *1 (Iowa Ct. App. Mar. 30, 2022) (quoting *State v. Lam*, 391 N.W.2d 245, 251 (Iowa 1986)).  In considering a motion to sever under the rule, the court follows a two-part analysis.  *See id.*; *see also State v. Romer*, 832 N.W.2d 169, 183 (Iowa 2013).  The first part considers whether there was a common

scheme or plan, while the second turns on whether there is good cause to sever the charges. *See Romer*, 832 N.W.2d at 181–83. Johnson challenges both parts of the analysis.

For the first, Johnson argues the "amount of time between the allegations involving K.H.M. and those involving G.J. demonstrate they were not linked by a single, continuing motive, and thus they were not part of a common scheme or plan." *See Elston*, 735 N.W.2d at 198–99 (stating that "transactions or occurrences are part of a 'common scheme or plan' . . . when they are the 'products of a single or continuing motive'" (citations omitted). While recognizing "an obvious significant gap in time between the events," the district court found that factor was not dispositive. We agree.

"Iowa cases have not set a high bar for identifying a 'single or continuing motive.'" *State v. Wise*, No. 19-1353, 2021 WL 1400771, at *2 (Iowa Ct. App. Apr. 14, 2021). More specifically, "[i]n ascertaining whether a common scheme or plan exists, we have found it helpful to consider factors such as intent, modus operandi, and the temporal and geographic proximity of the crimes." *Elston*, 735 N.W.2d at 199 (cleaned up). We also evaluate whether "[t]he defendant carried out similar acts in similar ways." *State v. Umana*, No. 11-0667, 2012 WL 4513859, at *6 (Iowa Ct. App. Oct. 3, 2012).

As the district court found, a common plan or scheme can include a "desire to satisfy sexual desires through the victimization of children." *Elston*, 735 N.W.2d at 200; *accord Romer*, 832 N.W.2d at 182. That desire was present here with Johnson's sexual abuse of two young, female family members staying in his house. The acts were similar and carried out in like ways, starting with massages

before progressing to attempted, but unsuccessful, penetration of the victims' vaginas. Johnson's explanations for the acts were also similar. He blamed his abuse of K.H.M. on taking a sleep medication, and he claimed to have been asleep when the sexual conduct with G.J. happened. So even though Johnson's motive extended over several years, the court did not abuse its discretion in concluding the other factors weighed in favor of finding the offenses were part of a common scheme or plan. *See State v. Dicks*, 473 N.W.2d 210, 214 (Iowa Ct. App. 1991) (finding defendant's sexual abuse of children over several years qualified as a common plan or scheme to carry out "a long standing and continuing motive to gratify himself" despite lack of temporal proximity).

Moving onto the second part of the analysis, to prove the court abused its discretion in refusing to sever the charges, Johnson "bears the burden of showing prejudice resulting from joinder outweighed the State's interest in judicial economy." *Elston*, 735 N.W.2d at 199. On that point, Johnson argues he was prejudiced because "the evidence related to offenses allegedly committed against K.H.M. would not be admissible for any of the purposes listed in [Iowa Rule of Evidence] 5.404(b) in a trial on the counts involving G.J., and vice versa." But in *Romer*, the supreme court stated that "an attempt to equate our evidentiary rule's principles with [joinder] principles is inapposite." 832 N.W.2d at 183; *accord Lam*, 391 N.W.2d at 250. Our court has interpreted *Romer* to foreclose prejudice arguments based on rule 5.404(b). *See Crane*, 2022 WL 951075, at *2 ("In short, *Romer* forecloses Crane's argument that '[t]he evidence of each allegation was not cross-admissible, which would show prejudice.'"); *State v. Monson*, No. 21-0213, 2022 WL 951179, at *1 (Iowa Ct. App. Mar. 30, 2022) ("[T]he Iowa Supreme Court

has squarely rejected an Iowa Rule of Evidence 5.404(b) analysis in the formula."); *see also State v. Knapp*, No. 21-1243, 2023 WL 5607073, at *8 (Iowa Ct. App. Aug. 30, 2023); *State v. Cook*, No. 17-1524, 2018 WL 6120243, at *1 (Iowa Ct. App. Nov. 21, 2018); *State v. Taylor*, No. 17-0184, 2018 WL 739296, at *4 (Iowa Ct. App. Feb. 7, 2018); *State v. Perry*, No. 16-0884, 2017 WL 2876242, at *2 (Iowa Ct. App. July 6, 2017); *State v. Romilus*, No. 14-1425, 2015 WL 4935698, at *2 (Iowa Ct. App. Aug. 19, 2015). To the extent Johnson asks us to "clarify *Romer*, limit it to its circumstances (including an element specifically requiring proof of a pattern), or overrule it," we are not at liberty to do so. *See Crane*, 2022 WL 951075, at *2.

This leaves us with Johnson's related argument that the "similarities between the allegations involving K.H.M. and those involving G.J. . . . raise a substantial likelihood the jury would not be able to separate them in their minds and evaluate each count solely on the corresponding evidence." The jury, however, was instructed to do just that: "If you find the defendant guilty or not guilty on any one of the 19 counts, you are not to conclude the defendant is guilty or not guilty on the others. You must determine whether the defendant is guilty or not guilty separately on each count." *See id.* ("Notably, the district court gave the jury a limiting instruction."); *see also Romer*, 832 N.W.2d at 183 (finding no unfair prejudice where the jury was instructed "to look at each of the eight counts separately and reach a verdict on each count separately"). "We presume the jury follows the district court's instructions." *Perry*, 2017 WL 2876242, at *2.

For these reasons, we find no abuse of discretion in the district court's denial of Johnson's motion to sever.

**B.    Use of Peremptory Strikes**

Johnson's second claim is the "district court improperly excused the jury panel prior to ruling" on his *Batson* challenge "and erred in denying that challenge." In *Batson*, the United States Supreme Court held that the Equal Protection Clause forbids a prosecutor from using peremptory strikes to exclude potential jurors on account of their race.  476 U.S. at 89.  Less than one decade later, the Court extended this principle to include gender discrimination in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130 (1994).  To challenge the State's exercise of a peremptory strike under these cases, the party alleging gender discrimination must make a prima facie showing of intentional discrimination.  *J.E.B.*, 511 U.S. at 144–45.  If that showing is made, the State must then provide a gender-neutral basis for exercising the peremptory challenge.  *Id.* at 145.  In the end, "the challenging party must carry the ultimate burden of proving purposeful discrimination."  *Booker*, 989 N.W.2d at 627 (outlining the three-step inquiry under *Batson*'s burden-shifting framework).  "We conduct a de novo review of the record when making this inquiry . . . ."  *Id.*

The district court stopped at the first step of the inquiry, finding Johnson "failed to present a showing that gives rise to [an] inference of discrimination."  The State argues we should stop even earlier than that because Johnson's challenge was made after the three small group panels were dismissed.[4]  *See State v.*

---

[4] Johnson argues the court "committed structural error by dismissing the jury panel prior to ruling on" his challenge "because that act effectively made relief impossible before deciding the issue on the merits."  As a result, Johnson contends that he is entitled to a new trial regardless of the merits of his challenge.  But the merits of the challenge matter.  That's because, as the State points out, if the district court was correct in denying the challenge, Johnson "would have had a fair jury and trial,

*Ford*, 992 N.W.2d 641, 647 (Iowa Ct. App. 2023) ("By waiting until the panel members were dismissed before raising his objection that the State used its peremptory challenges in a gender-biased, discriminatory fashion, Ford waived the objection."). We elect to bypass this error-preservation concern because of the unique way jury selection was conducted under the COVID-19 measures then in place. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999) (bypassing error-preservation problem and proceeding to merits of appeal).

On the merits of Johnson's claim, we agree with the district court that Johnson did not establish a prima facie case of purposeful gender discrimination. The court reasoned:

> Defendant relies solely upon the argument that the State used five of its six strikes to remove men. This argument is undermined by the fact men are not significantly underrepresented in the jury selected. Of the twelve jurors and two alternates, six jurors are men meaning that they constitute a little less than half the jury.

In reaching this conclusion, the court cited *State v. Knox*, 464 N.W.2d 445, 448 (Iowa 1990), which held that "[m]erely showing that the State used a peremptory challenge to exclude [a] juror falls short of raising an inference of purposeful discrimination." *Cf. Booker*, 989 N.W.2d at 629 ("*Batson* necessarily requires a heavily context-specific inquiry, so although striking the sole Black juror

---

and no juror would have been excluded for discriminatory reasons." *See State v. Brimmer*, 983 N.W.2d 247, 270 (Iowa 2022) ("Structural errors are 'structural' because they affect 'the framework within which the trial proceeds,' 'infect the entire trial process,' and undermine the ultimate 'determination of guilt or innocence.'" (citation omitted)). We agree with the State that granting Johnson a new trial for "an unmeritorious *Batson* or *J.E.B.* challenge simply because the district court prematurely dismissed the jury panel" would not "vindicate any constitutional right and would result in an unjustified windfall to a defendant." *Cf. Thongvanh v. State*, 938 N.W.2d 2, 13 (Iowa 2020) ("[U]nlawful discrimination in the jury-selection process is structural error.").

does not, *in a vacuum*, establish a prima facie case, that fact in itself is relevant to the analysis and may be sufficient when viewed in context."). We agree with the court that, considering the number of men left on the jury, more was needed to satisfy the first step here. *Cf. State v. Griffin*, 564 N.W.2d 370, 376 (Iowa 1997) ("The prosecutor in this case exercised her peremptory challenges on the only two African-American prospective jurors, thereby establishing a prima facie case of purposeful discrimination."); *accord State v. Graham*, No. 98-1631, 2000 WL 62944, at *6 (Iowa Ct. App. Jan. 26, 2000) (finding that the defendant established a prima facie case of discrimination "by showing the prosecutor struck 'the two black people'").

"In determining whether a defendant has established the requisite showing of purposeful discrimination, the court should consider all relevant circumstances including, but not limited to, a pattern of strikes against . . . jurors, as well as the prosecutor's questions and statements during voir dire." *Knox*, 464 N.W.2d at 448. As the State points out, "during voir dire, the prosecutor either moved for or joined in Defendant's motions to remove 10 women from the jury." And the prosecutor resisted one of defense counsel's for-cause challenges to a male juror and challenged two other male jurors for cause. Finally, Johnson has not pointed to any questions or statements made by the prosecutor during voir dire that would show a discriminatory intent. Under these circumstances, we find the district court correctly denied Johnson's challenge.

### C. Sufficiency of the Evidence

For his third claim on appeal, Johnson argues two of his convictions for third-degree sexual abuse "are unsupported by sufficient evidence, because the

evidence does not support the conclusion that K.H.M. was fourteen or fifteen years old at the time of each alleged offense, or that the various incidents described were sexual in nature."[5]

We review challenges to the sufficiency of the evidence supporting a conviction for correction of errors at law. *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). As our supreme court stated in *Crawford*,

> When evaluating the sufficiency of the evidence, we consider whether, taken in the light most favorable to the State, a finding of guilt is supported by substantial evidence in the record. There is substantial evidence if the evidence would convince a rational fact finder the defendant is guilty beyond a reasonable doubt. We draw all legitimate inferences in support of the verdict. However, evidence which merely raises suspicion, speculation, or conjecture is insufficient. The evidence must at least raise a fair inference of guilt as to each essential element of the crime.

*Id.* at 516–17 (cleaned up).

Johnson concedes the evidence was sufficient to establish one count of third-degree sexual abuse for his actions in June 2010, when he "put his penis on top of [K.H.M.'s] vagina" during a sleepover at his house. But he contends "[n]one of the other descriptions included enough information for a reasonable jury to conclude beyond a reasonable doubt she was fourteen or fifteen." We disagree.

True, the record does not contain K.H.M.'s date of birth, and her testimony about her age during some of the incidents was not precise. For instance, as

---

[5] The jury was instructed that the State had to prove all the following for each count of third-degree sexual abuse:
  1. On or about January 1, 2010, through June 9, 2010, the defendant performed a sex act with K.H.M.
  2. The defendant performed the sex act while K.H.M. was 14 or 15 years of age.
  3. The defendant was K.H.M.'s uncle at the time of the act.

Johnson notes, K.H.M. could not remember how old she was when he "got his penis out and told me to pat it." As for the time when she was leg wrestling with Johnson and felt his penis pressing against her vagina, K.H.M. testified that she was in middle school and "between ten, thirteen, fourteen" years old. The State was not, however, limited to those incidents. *See State v. Constable*, 505 N.W.2d 473, 478 (Iowa 1993) (considering "all evidence presented at trial" in examining the sufficiency of the evidence); *see also State v. Knudsen*, No. 17-0531, 2018 WL 4922954, at *6 (Iowa Ct. App. Nov. 7, 2018) (noting that while the State argued the jury should find the defendant guilty based on a specific factual scenario, the defendant "has not provided, and we have not found, any authority that the jury was then required to consider solely this incident of abuse" in determining the defendant's guilt).

K.H.M. testified there "were several times he did the thing where he pushed down on my vagina with his penis, but we had clothes on." When asked how often that happened, K.H.M. said it "kept going" "at least every other month or every month" before the last time in June 2010. *See Constable,* 505 N.W.2d at 478 ("[B]y engaging in five distinct and separate sex acts, Constable committed five counts of sexual abuse."). Johnson's ex-wife testified that K.H.M. was fourteen in 2010, and K.H.M. testified that at the time of trial in April 2022, she was twenty-six years old. Counting backwards from there would mean that in April 2010, K.H.M. was fourteen years old. And on cross-examination, when K.H.M. was asked, "you believe that you were touched inappropriately by my client from the age of seven until fourteen; is that right?" she responded, "I don't believe. I know I was." Viewing this evidence in the light most favorable to the State, we find substantial evidence

in the record that K.H.M. was fourteen years old when the bi-monthly or monthly acts where Johnson pushed down on her vagina with his penis occurred. *See State v. Griffin*, 386 N.W.2d 529, 532 (Iowa Ct. App. 1986) ("[S]ome liberality must be permitted in the specification of time and place where young children are involved . . . ."); *see also State v. Schaefer*, No. 09-0586, 2011 WL 768817, at *2 (Iowa Ct. App. Mar. 7, 2011) (finding substantial evidence of defendant's age even though "the State presented no direct evidence of the defendant's age").

We also find substantial evidence that these acts were sexual in nature. The jury was instructed that a "'sex act' means any sexual contact" between, among other things, "the genitals of one person and the genitals or anus of another." *See* Iowa Code § 702.17 (2010). Johnson argues that "K.H.M.'s testimony about contact when she popped Johnson's back was insufficient to establish the contact was sexual in nature" because "they were clothed" and "there was a legitimate, nonsexual purpose for the contact (back popping or expressions of familial affection)." We disagree.

For starters, "skin-to-skin contact is not required to establish a 'sex act' under section 702.17." *State v. Pearson*, 514 N.W.2d 452, 455 (Iowa 1994). And while Johnson may have testified to a nonsexual purpose for the contact, the jury was not required to believe him. *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) ("The jury is free to believe or disbelieve any testimony as it chooses . . . ."). The jury was instructed that "in deciding whether the contact was sexual in nature," it could "consider the type of contact and the circumstances surrounding it." *Accord Pearson*, 514 N.W.2d at 455 (providing factors to evaluate whether contact was sexual in nature). K.H.M. testified these back-popping

sessions usually happened when her aunt was at work and she was left to herself. *See id.* (considering "whether anyone else was present" and "the purposefulness of the contact"). Johnson would "be laying on the bed, and it would start out he would have me pop his back, and then he would usually flip me over or either go on top of me or something in that general—it was just always about the same." *See id.* (looking at "where and when the contact took place"). These sessions lasted "more than probably ten minutes," and she could sometimes feel Johnson's hard penis rubbing against her. *See id.* (examining "whether the contact was made to arouse or satisfy the sexual desires of the defendant").

Johnson admitted to some of this conduct during his interview with the criminal investigator about G.J.'s charges. He told the investigator that before the incident in June 2010, which he "felt absolutely terrible" about, there was another time when he touched K.H.M. and there was contact between his penis and her vagina. On that occasion, Johnson was "rubbing in between her legs" over her pants and having her grind on him when they were wrestling. He admitted knowing "it was wrong" and trying to fight his urges. When considering all the evidence in the light most favorable to the State, we find substantial evidence that these acts were sexual in nature. *See Crawford*, 977 N.W.2d at 517.

### D. Consecutive Sentences

For his final claim, Johnson contends the district court "failed to give sufficient reasons for imposing consecutive sentences." *See State v. Hill*, 878 N.W.2d 269, 275 (Iowa 2016) (requiring sentencing courts to "explicitly state the reasons for imposing a consecutive sentence"). The State agrees. We

accordingly vacate that portion of the sentencing order and remand for resentencing on whether the sentences should run concurrently or consecutively.

## III.    Conclusion

We affirm Johnson's convictions but vacate his sentences in part and remand for resentencing on whether the sentences should run concurrently or consecutively.

**CONVICTIONS AFFIRMED, SENTENCES AFFIRMED IN PART AND VACATED IN PART, AND REMANDED FOR RESENTENCING.**